IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 18, 2005 Session

## PATRICIA CONLEY, AS EXECUTOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF MARTHA STINSON, DECEASED

v.

## LIFE CARE CENTERS OF AMERICA, INC., ET AL.

**Appeal from the Circuit Court for Hickman County**
**No. 00-5064C-II     Timothy L. Easter, Judge**

---

**No. M2004-00270-COA-R3-CV - Filed on January 4, 2007**

---

The estate of a former nursing home resident brought this wrongful death action, asserting sundry claims against the nursing home arising out of an attack on Mrs. Stinson by another resident. As a result of the attack, Mrs. Stinson was hospitalized and treated for injuries including a broken hip. She died four months later of pneumonia. Initially, the claims against the nursing home sounded principally in medical malpractice, with the plaintiff contending the attack, injuries, and death were the result of a variety and series of acts and omissions of the nursing home, including failing to properly screen and/or subsequently discharge the resident who attacked Mrs. Stinson. The plaintiff additionally asserted claims against Genesis of Jackson, Inc., a provider of psychiatric services, and the State of Tennessee, contending they, along with the nursing home, were responsible for determining whether the resident who assaulted Mrs. Stinson should have been admitted or retained as a resident at the nursing home. The plaintiff's claim against Genesis was dismissed by the trial court, and the claim against the State was denied by the Claims Commission. The plaintiff sought to amend the complaint to add a claim for attorney fees against the nursing home under the Tennessee Adult Protection Act. The trial court dismissed the TAPA claim finding the plaintiff's claims sounded in medical malpractice and therefore, by statute, the exclusive remedy was under the Medical Malpractice Act. The plaintiff's medical malpractice claims against the nursing home went to the jury. Following a six-day jury trial, the plaintiff was awarded $130,000 in compensatory damages against the nursing home. The plaintiff and the nursing home appeal. We affirm in part, vacate in part, and remand the surviving claims for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Vacated in Part, and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. PATRICIA J. COTTRELL, J., filed a concurring opinion.

Eugene R. Hallworth, Columbia, Tennessee, and Jeffrey J. Downey, Washington, D.C., for the appellant, Patricia Conley, as Executor and Personal Representative of the Estate of Martha Stinson, Deceased.

T. O. Helton and Christy T. Crider, Nashville, Tennessee, for the appellant, Life Care Centers of America, Inc.

M. Bradley Gilmore, Nashville, Tennessee, for the appellee, Genesis of Jackson, Inc., d/b/a Geri-Srvs.

J. Mark Benfield and R. Sadler Bailey, Memphis, Tennessee, Cameron C. Jehl, Little Rock, Arkansas, counsel for the *Amicus Curiae*, The Tennessee Trial Lawyers Association.

Christopher Connell Puri, Nashville, Tennessee, counsel for the *Amicus Curiae*, The Tennessee Health Care Association.

**OPINION**

**I.**
**THE FACTS**

The matters on appeal arise from an attack by James Johnson on Martha Stinson while the two were residents of Centerville Health Care Center, a nursing home owned and operated by Life Care Centers of America, Inc. (hereinafter Life Care). Although the events leading up to the assault on January 1, 2000, are controverted, it is undisputed that Mr. Johnson struck Mrs. Stinson while they, along with other residents and care givers, were gathered in the dining area. Moments before the attack, Mr. Johnson dropped a piece of paper on the floor, immediately following which he displayed signs of agitation and engaged in what were described as "boxing-like" motions. When Mrs. Stinson stepped forward to pick up the paper, Mr. Johnson struck her, knocking her to the ground. Mrs. Stinson was immediately transported to a hospital where she was treated for a broken hip and other traumatic injuries. She remained in the hospital for several days. Upon discharge from the hospital, Mrs. Stinson was transferred to a rehabilitation facility. She never returned to Life Care. Mrs. Stinson died four months later, in April of 2000. Pneumonia was identified as the cause of death.

The matters at issue are not limited to alleged acts and omissions of Life Care on the day of the assault. They also pertain to alleged acts and omissions of Life Care, Genesis of Jackson, Inc., and the State of Tennessee occurring over a period of months leading up to the assault. Accordingly, we will review the relevant history prior to the day of the assault.

Mrs. Stinson was admitted as a resident to Life Care on March 24, 1998. She was 75 years of age at the time. It was her first admission to a nursing home. Mr. Johnson was admitted to Life Care in August 1998, when he was 78 years of age. It was not his first admission to such a nursing

home or health care facility. Mr. Johnson had been a resident of an in-patient psychiatric facility known as Generations immediately prior to being admitted to Life Care.

At all times relevant to the matters at issue, the Preadmission Screenings and Annual Resident Review Program Division of the State of Tennessee (the "State") screened applicants seeking admission to health care centers (nursing homes) in Tennessee. The purpose of the screening was to place each applicant in an appropriate health care center, nursing home and/or skilled nursing facility. Mr. Johnson was evaluated by the State on at least two occasions prior to his admission to Life Care. He was evaluated by the State in 1996 and 1997 as part of its annual retention review protocol, and on each occasion Mr. Johnson was found to be appropriate for admission to the general population of a nursing home like Life Care.

In its evaluations, the State considered whether Mr. Johnson posed a threat to other residents and whether he required specialized mental health services. When Mr. Johnson was to be discharged from Generations in 1998, the State evaluated and approved him for placement at Life Care. Following his admission to Life Care, the State conducted an annual evaluation of Mr. Johnson in February of 1999 and determined he was appropriately placed and could remain in the general population at Life Care.[1]

In addition to evaluations by the State, Mr. Johnson was evaluated periodically by Genesis of Jackson, Inc., prior to and during his residency at Life Care. Moreover, Genesis was under contract with Life Care to provide mental health services for the residents at Life Care, which it provided through its staff of psychiatrists and psychologists. Pursuant to the contract with Life Care, Genesis provided these services for Mrs. Stinson and Mr. Johnson throughout their residency at Life Care.[2]

Following his admission to Life Care, Genesis visited Mr. Johnson on a weekly basis. This continued throughout his seventeen-month residency at Life Care. At no time did Genesis recommend that Mr. Johnson be discharged or segregated from the general population at Life Care. To the contrary, following a routine visit with Mr. Johnson in December 1999, which was one month prior to the assault, Dr. Cheri Premeau, a psychiatrist with Genesis, noted that Mr. Johnson was doing well, that he did not require routine specialized mental health services, and that he did not pose a danger to himself or others.

---

[1] Additional evidence suggesting that Mr. Johnson was appropriately placed at Life Care was that after his admission to Life Care in August 1998, but prior to the review by the State in February of 1999, the Senior Care Program at Baptist Hospital came to Life Care to evaluate whether Mr. Johnson would qualify for an out-patient intensive mental health day care service Baptist offered. Only persons with serious mental health conditions qualified for the partial hospitalization program offered by Baptist. The program brought Mr. Johnson to the hospital for a trial visit, and after the examination, the program found Mr. Johnson did not qualify for the partial hospitalization for mental health services.

[2] Genesis had also provided similar services for Mr. Johnson when he resided at Generations.

As for Mrs. Stinson, other than the tragic events that occurred on January 1, 2000, Mrs. Stinson's twenty-two month residency at Life Care was generally satisfactory, with a few exceptions.[3]

## II.
### THE PROCEDURAL HISTORY

The initial Complaint was filed on July 21, 2000. The only defendant named in the Complaint was Life Care. In that Complaint, Plaintiff contended, *inter alia*, that Mr. Johnson was a psychotic patient with a history of unprovoked attacks on others who should not have been admitted to Life Care and/or who should have been discharged long before the attack on Mrs. Stinson, that Life Care was negligent by admitting and retaining Mr. Johnson as a resident, by failing to protect Mrs. Stinson from Mr. Johnson, and by failing to properly supervise Mr. Johnson. Life Care answered denying it was negligent and denying liability.

Several months later, Life Care amended its Answer, adding as an affirmative defense the doctrine of comparative fault. While continuing to deny it was negligent or liable, Life Care asserted in the alternative that if it was at fault, it relied on the professional advice rendered by Genesis and the State to admit and retain Mr. Johnson. Therefore, Life Care contended, if it was found to be negligent, the fault, if any attributable to Genesis and the State of Tennessee, should be apportioned to reduce Life Care's liability.

As a consequence of the comparative fault defenses asserted by Life Care in its Amended Answer, Plaintiff amended its Complaint to assert similar claims against Genesis and the State of Tennessee. The claim against Genesis was pursued in this action. The claim against the State was pursued in the Claims Commission.

Subsequently, in January of 2002, Plaintiff filed a Motion to File Second Amended Complaint, to allege claims against Life Care for violating the Tennessee Adult Protection Act (TAPA). Plaintiff's Motion to Amend was denied.[4] The trial court found Plaintiff's claims were rooted in medical malpractice, and therefore, the Medical Malpractice Act was Plaintiff's exclusive remedy.

The parties filed a number of Motions for Partial Summary Judgment. Plaintiff's claims regarding negligent care provided to Mrs. Stinson prior to January 1, 2000, were dismissed. The dismissed claims pertained to dietary maintenance, toileting, assessments, grooming and hygiene, falls, elopements, allegations of improper use of psychotropic medicine, and deficient recreational

---

[3] Mrs. Stinson walked away from the facility without permission or supervision on a couple of occasions. These events are referred to as elopements.

[4] When the motion to amend the complaint was denied, Plaintiff filed a Motion to Reconsider attached to which was a proposed Third Amended Complaint which stated the same TAPA claims only with more particularity. The Motion to Reconsider was denied.

and psycho-social care. The claims were premised in part on various federal regulatory standards, which Life Care contended had no bearing on standards of care and amounted to an imposition of a national standard of care. The trial court summarily dismissed these claims finding Plaintiff failed to provide any factual allegations of breach of the standard of care under these regulations, and the expert affidavits filed by Plaintiff failed to establish that Mrs. Stinson suffered any injury as a result of the failure to provide proper: (1) dietary maintenance, (2) toileting, (3) activities of resident assessment, (4) grooming, (5) hygiene and (6) care planning. The court also explained it found the claims deficient "to the extent that" the claims were premised on a national standard of care. Further, the trial court dismissed Plaintiff's claims regarding elopements, psycho-social care and activities, and psychotropic medication. The court explained the elopements and alleged lack of psycho-social care and activities had nothing to do with the injuries Mrs. Stinson sustained on January 1. As for the alleged negligent use of the psychotropic medication, the trial court dismissed the claim. The court determined the claim was not supported by competent evidence, finding it was improperly based on the opinion of a nurse.

Life Care was successful in excluding some of the evidence proffered by Plaintiff. The trial court granted motions in limine to exclude evidence regarding deficiencies found by the Department of Health. The trial court also excluded medical records from the Middle Tennessee Mental Health Institute (MTMHI), to which Mr. Johnson was transferred following the assault on Mrs. Stinson. The records contained notations stating that Mr. Johnson had "hit" four staff members at "Centerville Health Care Center" and struck out at "residents." Plaintiff proffered the records to establish Life Care had notice concerning Mr. Johnson's conduct prior to the assault on Mrs. Stinson. The trial court ruled that Plaintiff could not introduce the records in evidence unless the declarant could be identified. Plaintiff, however, was unable to identify the declarant. At trial, the court excluded a portion of the testimony of Bessie Shepard, deeming it unreliable hearsay.[5] Mrs. Shepard, a visitor on the day Mrs. Stinson was injured, was to testify about a statement she attributed to a nurse's aid moments prior to Mr. Johnson striking Mrs. Stinson.

Genesis also filed a motion for summary judgment seeking dismissal of Plaintiff's claims against it in the amended complaint. Life Care opposed the motion, but Plaintiff did not. The trial court conducted a hearing on this motion on December 4, 2002, and, on March 6, 2003, entered an order granting Genesis's motion and dismissing Plaintiff's claims against Genesis.

The case proceeded to trial on Plaintiff's claims that Life Care was liable for admitting Mr. Johnson as a resident of the nursing home, failing to discharge Mr. Johnson thereafter, failing to properly supervise him, and failing to protect Mrs. Stinson.[6] On November 1, 2003, after a six-day trial, the jury returned a plaintiff's verdict of $130,000 in compensatory damages, all of which was assessed against Life Care. Both parties appeal, raising numerous issues.

_____

[5] Plaintiff filed a Motion to Reconsider the exclusion of Mrs. Shepard's testimony, which the trial court denied.

[6] Plaintiff also sought punitive damages against Life Care. The issue went to the jury and the jury found punitive damages were not justified. That part of the verdict is not challenged on appeal.

## III.
## THE ISSUES

Plaintiff and Life Care each raise a number of issues on appeal. Plaintiff contends the trial court erred by (1) denying leave to amend the Complaint to assert TAPA claims; (2) by excluding Bessie Shepard's recollection of what she believes a nurse's aide said immediately prior to the assault; (3) excluding records from MTMHI concerning Johnson's prior history at Life Care; (4) excluding records of regulatory violations assessed by the Tennessee Department of Health; (5) excluding evidence regarding the alleged neglect of Mrs. Stinson during the months prior to the assault; and (6) summarily dismissing various tort claims against Life Care which were premised upon federal regulations. Plaintiff also contends the trial court erred by allowing the jury to consider whether it should comparatively allocate fault against the State of Tennessee.

Life Care contends the trial court erred by (1) admitting into evidence the testimony of Plaintiff's three expert witnesses; (2) summarily dismissing Plaintiff's claims against co-defendant Genesis; (3) denying Life Care's Motion for Summary Judgment on the issue of discharging Mr. Johnson; (4) excluding evidence of Plaintiff's claim against the State of Tennessee before the Claims Commission; and (5) awarding Plaintiff discretionary costs.

## IV.
### PLAINTIFF'S PROPOSED SECOND AMENDED COMPLAINT – THE TAPA CLAIMS

Plaintiff contends the trial court erred by denying leave to file the proposed Second Amended Complaint[7] to assert TAPA claims against Life Care. The trial court denied the Motion to Amend, citing Tenn. Code Ann. § 71-6-120(g) and stating, "this is a cause of action within the scope of Title 29, Chapter 26 and, therefore, this action shall be governed only by Title 29, Chapter 26, and the Tennessee Adult Protection Act does not apply." We have concluded the trial court erred by denying Plaintiff leave to amend; however, the error was harmless because Plaintiff failed to state a claim upon which relief can be granted under TAPA.

### A.

For purposes of appeal, it is significant whether the trial court denied the Motion to Amend pursuant to Tenn. R. Civ. P. 15 or 12.02(6). This is because our review of a trial court's decision regarding a Rule 15 Motion to Amend is substantially more constrained than our review of the dismissal of a claim pursuant to Rule 12.02(6). Whether to grant a Rule 15 Motion to Amend is within the sound discretion of the trial court, and a reviewing court will not reverse such a decision absent an abuse of discretion. *Fann v. City of Fairview*, 905 S.W.2d 167, 175 (Tenn. Ct. App. 1994). Such decisions may be set aside on appeal if we find the trial court applied an incorrect legal

---

[7]Plaintiff filed a Motion to File A Second Amended Complaint, attached to which was the proposed Second Amended Complaint. That motion was denied. Thereafter, Plaintiff filed a Motion to Reconsider to which was attached the proposed Third Amended Complaint. The Motion to Reconsider was also denied.

standard or misconstrued or misapplied the controlling legal principles. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)).

In sharp contrast from the above, in an appeal from an order granting a Rule 12.02(6) Motion to Dismiss, we review the trial court's legal conclusions regarding the adequacy of the complaint *de novo* without a presumption of correctness. *Bell ex rel. Snyder v. Icard, et al,* 986 S.W.2d 550, 554 (Tenn. 1999); *Stein v. Davidson Hotel*, 945 S.W.2d 714, 716 (Tenn. 1997).

**B.**

When examining a Tenn. R. Civ. P. 15 Motion to Amend a pleading, the trial court may consider *inter alia* the following factors: lack of notice, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue delay in the filing of the motion, undue prejudice to the opposing party, and futility of the proposed amendment. *Hall v. Shelby County Ret. Bd.*, 922 S.W.2d 543, 546 (Tenn. Ct. App. 1995). The court, however, should not deny a plaintiff's Tenn. R. Civ. P. 15 Motion to Amend based on an examination of whether it states a claim on which relief can be granted. As the United States Supreme Court explained, "[i]f underlying facts or circumstances relied on by plaintiff may be proper subject of relief, he ought to be afforded opportunity to test his claim on merits and therefore should be permitted to amend complaint." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed.2d 222 (1962). If the legal sufficiency of the proposed Complaint is at issue – instead of delay, prejudice, bad faith or futility – the better protocol is to grant the motion to amend the pleading, which will afford the adversary the opportunity to test the legal sufficiency of the amended pleading by way of a Tenn. R. Civ. P. 12.02(6) Motion to Dismiss. *See McBurney v. Aldrich*, 816 S.W.2d 30, 33 (Tenn. Ct. App. 1991).

The record reveals that granting the Motion to Amend would not have delayed the case or prejudiced the defendants, except insofar as the claim itself might prevail. *HMF Trust v. Bankers Trust Co.*, 827 S.W.2d 296, 301 (Tenn. Ct. App. 1991). Accordingly, the better practice would have been to grant Plaintiff's Motion to Amend without prejudice to Life Care's right to test the legal efficacy of the Second Amended Complaint pursuant to Rule 12.02(6). Nevertheless, and without prejudice to either party, we find the trial court did indeed conduct a Tenn. R. Civ. P. 12.02(6) analysis, and dismissed the TAPA claims upon a finding Plaintiff's exclusive remedy was pursuant to the Medical Malpractice Act.

A Tenn. R. Civ. P. 12.02(6) Motion to Dismiss tests the sufficiency of a complaint, not the strength of the plaintiff's evidence. *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999); *Bell*, 986 S.W.2d at 554. It requires the courts to examine the substance of the complaint rather than its form. *Kaylor v. Bradley*, 912 S.W.2d 728, 731 (Tenn. Ct. App. 1995).

Courts reviewing a complaint tested by a motion to dismiss must construe the complaint liberally in favor of the plaintiff by taking all factual allegations in the complaint as true, and by giving the plaintiff the benefit of all reasonable inferences that can be drawn. *See Stein*, 945 S.W.2d

at 716; *see also* ROBERT BANKS, JR. & JUNE F. ENTMAN, TENNESSEE CIVIL PROCEDURE § 5-6(g), at 254 (1999). A Rule 12.02(6) motion admits the truth of the material factual allegations in the complaint but asserts that no cause of action arises from these facts. *Winchester v. Little*, 996 S.W.2d 818, 822 (Tenn. Ct. App. 1998); *Smith v. First Union Nat'l Bank*, 958 S.W.2d 113, 115 (Tenn. Ct. App. 1997).

Dismissal pursuant to Tenn. R. Civ. P. 12.02(6) is only warranted when the alleged facts will not entitle the plaintiff to relief or when the complaint is totally lacking in clarity and specificity. *Dobbs v. Guenther*, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992). (citations omitted.)

## C.

In the Motion To File Second Amended Complaint, Plaintiff stated the purpose of the amendment, being the addition of Count IV, was to clarify that Plaintiff was asserting a claim under the Tennessee Adult Protection Act simply to recover the attorneys' fees as a specific element of damages. In the motion, Plaintiff represented to the trial court:

4. Plaintiff in her initial complaint and amended complaint sought relief including costs and attorneys fees. Plaintiff seeks to pursue this amendment simply to clarify that the costs and Attorneys' fees and costs [sic] are being sought under the Tennessee Adult Protection Act as a specific element of damages under this case.

As one of several grounds asserted by Life Care in opposition to Plaintiff's Motion to Amend, Life Care contended the amendment was futile because the "Tennessee Adult Protection Act does not apply when a cause of action is asserted pursuant to Tennessee's Medical Malpractice statute." Life Care went on to argue to the trial court that the "gravamen of Plaintiff's Complaint falls within the scope of Tennessee's Medical Malpractice statute at § 29-26-115 et. seq.," noting that Plaintiff claimed *inter alia* that Life Care had deviated "from the accepted professional practice for nursing home facilities."

Plaintiff countered, contending its TAPA claims "distinguished between nursing malpractice claims and administrative and nurse aide negligence that fell outside the scope of the [Medical Malpractice Act]" and that "the decision to admit Mr. Johnson and the negligent supervision he was given by nurse aides on the day of the assault were not acts of health care practitioners within the purview of the [Medical Malpractice Act]."[8]

The trial court found the argument of Life Care more persuasive. In its Order denying leave to amend, the trial court found "this is a cause of action within the scope of Title 29, Chapter 26

---

[8]This contention appears in Plaintiff's brief in this Court. The distinctions to which Plaintiff refers are set forth in the proposed Third Amended Complaint, which was Plaintiff's second attempt to convince the trial court to grant leave to assert the TAPA claims. The proposed Third Amended Complaint is substantially the same as the proposed Second Amended Complaint but with more specificity as to the distinguishing factors to which Plaintiff makes reference.

[Medical Malpractice Act] and, therefore, this action shall be governed only by Title 29, Chapter 26, and the Tennessee Adult Protection Act does not apply."

We begin our analysis with a discussion of the essential elements of a claim for compensatory damages and attorneys' fees under the Tennessee Adult Protection Act.

### D.
### THE TENNESSEE ADULT PROTECTION ACT

The Tennessee General Assembly's stated purpose for enacting TAPA was to protect adults coming within the provisions of the act from abuse, neglect or exploitation. Tenn. Code Ann. § 71-6-101(a). TAPA affords "elderly persons" and "disabled adults"[9] the right of recovery in a civil action for compensatory damages for "abuse" or "neglect," as the terms are defined in the statute. Tenn. Code. Ann. § 71-6-120(a)(3). "Abuse or neglect" is defined in TAPA as meaning "the infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services that are necessary to maintain that person's health or welfare." Tenn. Code Ann. §71-6-120(1).

If it is proven that a defendant is liable for "abuse or neglect," the protected adult or next of kin may recover compensatory damages. *See* Tenn. Code. Ann. § 71-6-101(d). In addition, if abuse or neglect is proven, the claimant shall be entitled to recover reasonable attorneys' fees provided the abuse or neglect resulted from "intentional, fraudulent or malicious conduct" by the defendant, the burden of proof of which is "upon clear and convincing evidence." *Id*.

The claimant, however, may not recover damages or attorneys' fees under TAPA for a cause of action that lies within the scope of Title 29, Chapter 26, the Medical Malpractice Act. *See* Tenn. Code Ann. §71-6-120(g). TAPA expressly provides that the damages an elderly person or disabled adult may be entitled to recover under TAPA do not apply to a cause of action within the scope of the Medical Malpractice Act. To the contrary, TAPA provides that such action shall be governed solely by the Medical Malpractice Act. Tenn. Code Ann. §71-6-120(g).

Due to her age and disabilities, it is undisputed that Mrs. Stinson was both an "elderly person," and a "disabled adult" as defined by TAPA. *See* Tenn. Code. Ann. § 71-6-120(a)(2), (3). Moreover, Plaintiff, who is Mrs. Stinson's daughter and personal representative of her estate, is statutorily authorized to maintain this action on behalf of Mrs. Stinson. *See* Tenn. Code. Ann. § 71-6-120(b); § 20-5-106. Therefore, the first issue to be resolved is whether Mrs. Stinson was subjected

---

[9]TAPA defines a "disabled adult" as a person who is eighteen years of age or older and who meets one (1) of the following: (A) Has some impairment of body or mind that makes the person unfit to work at any substantially remunerative employment; (B) Lacks the capacity to consent; . . . Tenn. Code. Ann. § 71-6-120(a)(2). It also defines "elderly person" as one who is sixty years of age or older who has some mental or physical dysfunctioning, including any resulting from age. . . . Tenn. Code Ann. § 71-6-120(a)(3).

to "abuse or neglect" by Life Care, as distinguished from the actions of Mr. Johnson. If so, we then must decide whether the claim falls within the scope of the MMA.

Plaintiff's TAPA claims are set forth in Count IV, paragraphs 63 through 74, of the proposed Second Amended Complaint. The pertinent provisions are as follows:

SECOND AMENDED COMPLAINT
. . . .
Count IV
(Violations of Tennessee Adult Protection Act, Tenn. Code § 71-6-102 et seq & § 71-6-120)

63. At all times alleged herein, Martha Stinson was [sic] disabled adult within the meaning of Tenn. Code 71-6-120. She had mental impairments and lacked the capacity to consent.

64. Under applicable standards of care the Administrator of defendant's nursing home was charged with the responsibility of acting as gate-keeper of the facility, and must make the ultimate decision whether or not to admit a residents [sic].

65. The decision to admit a patient to a nursing home is an administrative decision, not a medical one. An Administrator is not a health care practitioner, as defined under Tennessee law.

66. Prior to Mr. Johnson being admitted to defendant Life Care the Administrator knew or should have known of Mrs. [sic] Johnson's medical history. He had attacked and injured multiple patients and care providers. He had sexually assaulted both residents and staff members. He had threatened to kill numerous people and had been diagnosed with homicidal intentions. His own psychologist warned defendant's staff that he represented an extreme risk of danger to staff and other residents. Notwithstanding this risk the Administrator of Life Care engaged in willful, wanton and reckless conduct by accepting Mr. Johnson into the general nursing home population. Such conduct constituted a substantial and unjustifiable risk to the patients of defendant's nursing home, including Martha Stinson, and constituted a gross deviation from the standard of care that would [sic] exercised by an ordinary person.

67. The ultimate decision to discharge a patient is also an administrative decision. Throughout his stay, Mr. Johnson displayed aggressive and delusional behavior that put defendants on notice that he represented a serious threat of injury to residents. Medical records of Mr. Johnson reflect numerous instances of inappropriate and aggressive sexual and physical behavior. Staff assessments indicate that he was combative and swinging at the staff. On March 15, 1999, he threatened to strike a CNA. Mr. Johnson was frequently concerned about people trying to kill him. On

-10-

July 9, 1999, the staff noted that he was becoming more combative. On October 31st it was noted that Mr. Johnson had been physically abusive to staff and residents.

68. Despite the clear risk that Mr. Johnson posed to residents, the Administrator of Life Care, in breach of applicable standards, failed to discharge Mr. Johnson. The decision not to pursue the discharge of Mr. Johnson was an administrative and economic decision, and was not a medical decision. Such conduct constituted a substantial and unjustifiable risk to the patients of defendant's nursing home, including Martha Stinson, and constituted a gross deviation from the standard of care that would [sic] exercised by an ordinary person.

69. As a direct result of the administrative breaches in the standards of care, as outlined above, Martha Stinson sustained great pain of body and mind, suffered severe emotional distress, incurred medical and out of pocket expenses, and sustained personal injuries including multiple fractures, contusions, bruises, hematomas and other injuries which lead [sic] to her untimely death.

70. On or about January 1, 2000, James Johnson and Martha Stinson were allowed to interact with each other in the cafeteria.

71. On that day Mr. Johnson and Mrs. Stinson were being monitored by nurse aids who were acting in a custodial capacity. Such aids provide basic assistance with acts of daily living, and supervision, and are not health practitioners as contemplated by the Tennessee Medical Malpractice Act. They are caretakers as defined under the Tennessee Adult Protection Act.

71.[sic] On January 1, 2000 Mr. Johnson was displaying agitated behavior. At that time, Mr. Johnson dropped a piece of paper on the floor. The nurse aid who was monitoring Mr. Johnson at that time stated that she was not going to pick of [sic] the piece of paper for fear that Mr. Johnson would strike her. This nurse aid, who was operating within the scope of her employment for defendant Life Care Centers of America Inc., proceeded to allow Mrs. Stinson to attempt to pick up the piece of paper, who was promptly assaulted by James Johnson. The nurse aid committed simple negligence in not separating Mr. Johnson from Mrs. Stinson, and allowing Mrs. Stinson to pick up the piece of paper.

72. As a direct result of the negligence committed by this nurse aid Martha Stinson sustained great pain of body and mind, suffered severe emotional distress, incurred medical and out of pocket expenses, and sustained personal injuries including multiple fractures, contusions, bruises, hematomas and other injuries which lead [sic] to her untimely death.

73. The actions, as described above, constitute abuse and neglect as defined under the Tennessee Adult Protection Act. Mrs. Stinson was deprived of proper administrative and nurse aid services which were necessary for her to maintain proper health.

. . .

Although Life Care vigorously denies the serious allegations, we must accept Plaintiff's allegations as true for the purpose of a Tenn. R. Civ. P. 12.02(6) analysis of the legal efficacy of the asserted claims. Accepting the factual allegations as true, the question is whether Plaintiff has set forth a claim of "abuse or neglect" of Mrs. Stinson *by Life Care*. As the statute provides:

> "Abuse or neglect" means *the infliction of* physical pain, injury, or mental anguish, or *the deprivation of services by a caretaker* that are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services that are necessary to maintain that person's health or welfare." (emphasis added)

Tenn. Code Ann. §71-6-120(1).

We are unable to conclude that the allegations in Count IV state a claim that Life Care, its employees, or agents abused or neglected Mrs. Stinson. To constitute abuse or neglect, Life Care – as distinguished from Mr. Johnson – had to inflict "physical pain, injury, or mental anguish"on Mrs. Stinson, or in the alternative, Life Care had to deprive Mrs. Stinson of services that were necessary to maintain the health and welfare of Mrs. Stinson. No matter how Plaintiff characterizes the acts or omissions of Life Care, its employees or agents in the proposed Complaint, Life Care's decision to admit and retain Mr. Johnson did not constitute an infliction of physical pain, injury or mental anguish (abuse or neglect) by Life Care upon Mrs. Stinson. Moreover, no matter how Plaintiff characterizes the sufficiency of the supervisory role played by the nurse's aide or the rapidity of her response when Mr. Johnson dropped the paper and then began to "shadow box" as Mrs. Stinson approached to pick up the paper, the response of the nurse's aide was neither an infliction of physical pain, injury or mental anguish on Mrs. Stinson by the nurse's aide nor was it the type of deprivation of services by a caretaker contemplated in Tenn. Code Ann. §71-6-120(1).

Instead of asserting a viable TAPA claim of abuse and neglect in Count IV, Plaintiff has essentially asserted a claim of strict liability against Life Care, contending Life Care was responsible for the actions by Mr. Johnson, all of which could have been prevented had Life Care not admitted Mr. Johnson as a resident and/or discharged him prior to the assault. We, therefore, find that Count IV of the proposed Second Amended Complaint fails to state a claim upon which relief can be granted.

In addition to seeking compensatory damages under TAPA for abuse and neglect, Plaintiff asserted a claim for attorneys' fees. In its Motion to Amend the Complaint, Plaintiff acknowledged that the only basis for its claim for attorneys' fees was pursuant to TAPA, specifically Tenn. Code

Ann. § 71-6-101(d). The statute provides that a claimant shall be entitled to recover attorneys' fees if "abuse or neglect" was proven. *See* Tenn. Code. Ann. § 71-6-101(d). Accordingly, a finding of abuse or neglect is a condition precedent to recovering attorneys' fees under a TAPA claim. Having failed to prove abuse and neglect by Life Care, Plaintiff is not entitled to present a claim for attorneys' fees.

## E.
## ARE THE TAPA CLAIMS WITHIN THE SCOPE OF THE MEDICAL MALPRACTICE ACT

The trial court dismissed the TAPA claims, finding the claims sounded in medical malpractice. Although we found the TAPA claims should be dismissed on another ground, our ruling does not mean that we disagree with the trial court's finding. To the contrary, we find that the TAPA claims, at least those pertaining to the admission and discharge of Mr. Johnson, sound in medical malpractice.

### THE MEDICAL MALPRACTICE ACT

Generally stated, a medical malpractice action is an action for damages for personal injury or death as a result of any medical malpractice by a health care provider, whether based upon tort or contract law. *Peete v. Shelby County Health Care Corp.*, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996). The Medical Malpractice Act requires that the plaintiff prove that the defendants failed to act in accordance with the recognized standard of acceptable professional practice and that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise occurred." *Richberger v. West Clinic, P.C.*, 152 S.W.3d 505, 509 (Tenn. Ct. App. 2004)(citing Tenn. Code Ann. 29-26-115).

Acts or omissions complained of in a medical malpractice action should involve matters of the medical arts and/or sciences that require specialized skills not ordinarily possessed by a lay person. *Peete*, 938 S.W.2d at 696 (citing *Graniger v. Methodist Hosp. Healthcare Sys., Inc.*, No. 02A01-9309-CV-00201, 1994 WL 496781, at *3 (Tenn. Ct. App. Sep. 9, 1994)) (other citations omitted). Conversely, a medical malpractice claim does not include any action for damages as a result of negligence of a health care provider when medical care by such provider is not involved in such action. *Burris v. Hospital Corp. of America,* 773 S.W.2d 932, 934 (Tenn. Ct. App. 1989). To the extent the act or omission complained of could be assessed by the trier of fact based on common everyday experiences, it would not fall within the scope of the MMA. *See Peete*, 938 S.W.2d at 696 (citing *Graniger*,1994 WL 496781, at *3).

In medical malpractice cases, courts look to whether the decision, act, or omission complained of required the assessment of a patient's medical condition and whether the decision, act, or omission required a decision based upon medical science, specialized training or skill. *See Waller v. City of Memphis*, No. W2000-00913-COA-R3-CV, 2001 WL 846081, at *6 (Tenn. Ct. App. July 20, 2001). Where causes of action involve complaints about acts or omissions involving medical science and expertise, they fall within the scope of the MMA; where they do not involve

such training and knowledge, they generally sound in ordinary negligence. *See generally Peete*, 938 S.W.2d 693.

This Court has recognized, however, that not every allegation of negligence against a healthcare provider or a doctor is one for medical malpractice. *See Peete*, 938 S.W.2d at 696; *see also Pullins v. Fentress County Gen. Hosp.*, 594 S.W.2d 663 (Tenn. 1979) (hospital's alleged failure to keep premises free of spiders and other pests judged under ordinary negligence principles); *Spivey v. St. Thomas Hosp.*, 211 S.W.2d 450 (Tenn. Ct. App.1947) (hospital's liability for patient's fall from a hospital window treated as an ordinary negligence case). In *Peete*, the plaintiff "alleged that she was injured when an employee of Defendant attempted to dismantle an orthopedic suspension bar, which was not in use at the time, and allowed a portion of that apparatus to strike her in the head." *Peete*, 938 S.W.2d at 696. Based upon those facts, the *Peete* Court found the act of dismantling an orthopedic suspension bar constituted ordinary negligence, instead of medical malpractice, and thus the MMA did not apply. *Id*. In an effort to distinguish the two types of actions, the *Peete* court stated:

> Medical malpractice cases typically involve a medical diagnosis, treatment or other scientific matters. The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact.

*Id*. (quoting *Graniger*, 1994 WL 496781, at *3); *see also Harvey v. Wolfer*, No. 03A01-9512-CV-00452, 1996 WL 94819, at *2 (Tenn. Ct. App. March 6, 1996) (stating an allegation the physician was negligent in the manner the plaintiff was moved from the examination table – during which move the plaintiff was dropped to the floor – sounded more in common law negligence than medical malpractice).

In Count IV, Plaintiff contends the decision "to admit a patient to a nursing home is an administrative decision, not a medical one" and that an Administrator "is not a health care practitioner, as defined under Tennessee law." The Tennessee Health Care Association, which filed an *amicus curiae* brief, insists that applicable federal and state regulations make the appropriateness of placement of a resident a medical decision, not an administrative decision, for which a TAPA claim is unavailable.

The *amicus* makes the point that every person admitted to a Tennessee nursing home, such as Life Care, must be medically diagnosed. *See* Tenn. Comp. R. & Regs. § 1200-8-6-.05(2). It additionally makes the point a physician must personally approve a written recommendation that an individual be admitted to a nursing home and remain under the care of a physician while a resident of a nursing home. 42 CFR § 483.40; Tenn. Comp. R. & Regs. § 1200-8-6-.05(2). As the regulations provide, a nursing home must complete, prior to admission, a Medicaid Pre-Admission Evaluation that must be signed by a physician and contain sufficient medical substance so that nurses in the Pre-

Admission Evaluation Unit of the Bureau of TennCare may evaluate the assessment. Tenn. Comp. R. & Regs. § 1200-13-1-.10(2)(f); § 1200-13-1-.10(4) and (5).

Therefore, the applicable regulations establish as a matter of law that the protocol to determine whether to admit a resident to a nursing home is, in the first instance, a matter of medical science or art requiring specialized skills. As the Court in *Peete* explained, acts or omissions complained of which involve matters of the medical arts and/or sciences, requiring specialized skills not ordinarily possessed by a lay person, sound in medical malpractice. *Peete*, 938 S.W.2d at 696.

In spite of Plaintiff's contentions that the decisions to admit and retain Mr. Johnson were administrative decisions that were based on economics, we have concluded that the key decision, whether Mr. Johnson was appropriate for placement in the general population of Life Care's nursing home, involved matters of the medical arts and/or sciences, requiring specialized skills not ordinarily possessed by a lay person. The fact the Administrator of Life Care was also involved in the decisions to admit and retain Mr. Johnson as a resident does not eviscerate the decisions and recommendations by the medical personnel that Mr. Johnson was appropriate for placement in the general population of Life Care's nursing home. To the contrary, the Administrator of Life Care is also a licensed healthcare professional under Tenn. Code Ann. §§ 63-16-101 through -115 (2004).[10] As a consequence, for medical malpractice purposes the Administrator's licensure places her in the same status for the purpose of Tenn. Code Ann. § 29-26-115 (Supp. 2006), that of "a person in the healthcare profession requiring licensure." *See Peete*, 938 S.W.2d at 696.

Considering all of the above, we have concluded that the decisions to admit and retain Mr. Johnson fall within the scope of the Medical Malpractice Act, which precludes a claim under TAPA. Therefore, Count IV of the proposed Second Amended Complaint fails to state a claim for which relief can be granted under TAPA.[11]

# V.
## THE COMPARATIVE FAULT CLAIM AGAINST THE STATE OF TENNESSEE

The trial court granted Life Care leave to amend its Answer to identify Genesis of Jackson, Inc., and the Preadmission Screenings and Annual Resident Review Program Division of the State of Tennessee (the State) as alleged tortfeasors who should share fault in the event Life Care was found to be at fault. Plaintiff moved to strike the comparative fault defenses. When it failed in its attempt to remove the so-called "empty chairs" created by Life Care's strategic affirmative defense, Plaintiff amended its Complaint by adding Genesis as an additional defendant and by asserting a

---

[10]The requisite qualifications for licensure as a licensed nursing home administrator are subject to the criteria set forth in Tenn. Code Ann. § 63-16-104 and preliminary education requirements satisfactory to the Board of Examiners for Nursing Home Administrators. The subjects of examination for applicants for licensure are determined by the Board of Examiners for Nursing Home Administrators. *See* Tenn. Code Ann. § 63-16-105.

[11]Based upon our ruling, we find it unnecessary to discuss whether the alleged acts or omissions of the nurse's aide on the day of the assault fall within the purview of the Medical Malpractice Act.

claim against the State, which it pursued before the Claims Commission.  In its claim against the State, Plaintiff contended the State "breached applicable standards of care in initially approving Mr. Johnson for nursing home care and in subsequently evaluating him while in the nursing home."

Plaintiff asserts on appeal that the trial court erred when it permitted Life Care to amend its Answer to identify the State as a comparative fault tortfeasor.  It also asserts the trial court erred by including the State on the jury verdict form to allow the jury to assess fault against the State.  We find both of these assertions to be without merit.

Whether to grant Life Care leave to amend its Answer was within the sound discretion of the trial court, and absent a showing of abuse of discretion, we will not disturb that decision.  *See Welch v. Thuan*, 882 S.W.2d 792, 793 (Tenn. Ct. App. 1994); *Pelts v. Int'l Med. Servs.*, No. W2002-00388-COA-R3-CV, 2003 WL 22071462, *11-12 (Tenn. Ct. App. Aug. 28, 2003) ("appellate review of a motion to strike is under the deferential abuse of discretion standard")(citing *Doe v. Mama Taori's Premium Pizza, L.L.C.*, No. M1998-00992-COA-R3-CV, 2001 Tenn. App. LEXIS 224, at *8 (Tenn. Ct. App. April 5, 2001)).  We find no error with that decision.

As for allowing the jury the option of assessing fault against the State, we find no merit with this argument because the jury assessed no percentage of the fault against the State.  Accordingly, there was no harm, and the issue is moot.

## VI.
### SUMMARY DISMISSAL OF THE NEGLIGENCE PER SE CLAIMS AGAINST LIFE CARE

The trial court granted in part and denied in part Life Care's motion to summarily dismiss Plaintiff's claims, including those based on alleged violation of federal regulations and a variety of claims regarding the general care of Mrs. Stinson.  The trial court granted partial summary judgment dismissing Plaintiff's claims to the extent they were based on a national standard of care.  The trial court also dismissed Plaintiff's claims that Life Care was negligent in failing to maintain proper hygiene for Mrs. Stinson, failing to adequately supervise her so as to prevent elopements, and failing to properly medicate her, based upon a finding the alleged neglect in her care did not contribute to the assault by Mr. Johnson.

### A.

Summary judgments do not enjoy a presumption of correctness on appeal.  *BellSouth Advert. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003).  This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied.  *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997).  We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor.  *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).  When reviewing the evidence, we first determine whether factual disputes exist. If a factual dispute exists, we then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine

issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

Summary judgments are proper in virtually all civil cases that can be resolved on the basis of legal issues alone, *Byrd,* 847 S.W.2d at 210*; Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001); however, they are not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. The party seeking a summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that party is entitled to judgment as a matter of law. *Godfrey*, 90 S.W.3d at 695. Summary judgment should be granted at the trial court level when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion, which is the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001). The court must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, discard all countervailing evidence, and, if there is a dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Byrd*, 847 S.W.2d at 210; *EVCO Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975). To be entitled to summary judgment, the moving party must affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

**B.**

Plaintiff asserted negligence per se claims against Life Care based upon alleged violations of federal regulations found in 42 C.F.R. § 483. The following are four of the fifteen regulations cited in paragraph 14 of the Third Amended Complaint to which Plaintiff contends Life Care had a duty to adhere:

a.      Pursuant to 42 C.F.R. § 483.10 the nursing home had an obligation and a duty to assure that resident's [sic] rights are followed and to assure that each residence [sic] has a dignified existence and the right to exercise his or her rights as a resident and as a citizen of the United States.

b.      Pursuant to 42 C.F.R. § 483.13(c) the nursing home had the duty to develop and implement written policies and procedures that prohibit mistreatment, neglect, abuse of residence [sic], and misappropriation of resident's [sic] property.

\* \* \* \*

g.      Pursuant to 42 C.F.R. § 483.25(f) the nursing home had a duty to ensure that residents who display mental or psychological adjustment difficulties, receive appropriate treatment and services to correct the assessed problem.

-17-

h.    Pursuant to 42 C.F.R. § 483.25(h) the nursing home had a duty to ensure that resident's [sic] environment remain free of accident hazards and that each resident receives adequate supervision and assistance to prevent accidents.

Plaintiff contended Life Care was required to maintain the nursing home in compliance with the minimum statutory standards and failing to do so constituted negligence per se.[12]  Life Care disagreed, arguing the federal regulations are too vague and general to be enforceable as standards. Life Care also contended the federal regulations, if applicable, would constitute a national standard of care.  We have concluded Life Care is correct on both grounds.

The federal regulations are simply too vague and general to constitute a standard of care by which a jury, or for that matter a court, can effectively judge the acts or omissions of health care providers and nursing home operators.  As aptly stated in *Smith v. Bowen*, 656 F. Supp. 1093 (D. Colo. 1987), "[t]here is no legislative definition of 'quality health care,' and there can be none." *Bowen*, 656 F. Supp. at 1097.  The *Bowen* court also held that federal nursing home regulations are so vague that enforcement arguably violates "commonly accepted principles of fundamental fairness" and gives rise to "a procedural due process concern." *Bowen,* 656 F. Supp. at 1097.  Furthermore, in a case dealing with the admissibility of the Nursing Home Patients' Bill of Rights, another court held, "The patients' rights are so broadly stated that submission of them to a jury as the standard of care would result in a speculative, ad hoc verdict completely unguided by any rational legal standards." *Makas v. Hillhaven, Inc.*, 589 F. Supp. 736, 742 (M.D.N.C. 1984).  In the matter of *Stogsdill v. Manor Convalescent Home, Inc.*, 343 N.E.2d 589 (1976), wherein the plaintiff brought a claim against a nursing home contending regulations established the standard of care as a matter of law, the court held the regulations were "too vague to be sufficient indicators of the standard of due care. . . ." *Stogsdill*, 343 N.E.2d at 611-612.

Plaintiff's claims that are based upon alleged violations of federal regulatory standards constitute a national standard of care that runs afoul with the MMA.  Tenn. Code Ann. § 29-26-115 requires a plaintiff in a medical malpractice action to prove by expert testimony (1) the standard of care, (2) that defendants deviated from that standard, and (3) that as a proximate result of the defendant's negligent acts or omissions, the patient suffered injuries which would not otherwise have occurred.  Of particular significance, the statute requires the plaintiff to establish by expert testimony the "recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community . . ."  Tenn. Code Ann. § 29-26-115(a)(1).

By statute, Tennessee courts must apply the so-called "locality rule" in medical malpractice actions.  Pursuant to that rule, "a plaintiff must show that the defendant failed to act with ordinary and reasonable care when compared to the customs or practices of physicians from a particular geographic region." *Sutphin v. Platt*, 720 S.W.2d 455, 457 (Tenn. 1986).  The United States of America fails to qualify as "a particular geographic region." *Id.*

---

[12]Plaintiff also contended the regulations served as a basis for its breach of contract claim.

In this medical malpractice action, Plaintiff must prove the "recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices [Centerville, Tennessee] or in a similar community at the time the alleged injury or wrongful action occurred." Tenn. Code Ann. § 29-26-115(1). The statutory scheme does not permit a plaintiff in a medical malpractice action to rely on a so-called national standard of care to establish a violation of acceptable professional practices in a medical community in Tennessee.

## C.

The trial court summarily dismissed Plaintiff's claims relating to Mrs. Stinson's dietary maintenance, toileting, resident assessment activities, grooming, hygiene, and care planning. We have concluded as the trial court did that the evidence fails to demonstrate how the alleged errors or omissions had any bearing on or relevance to the assault by Mr. Johnson. Therefore, summary dismissal of these claims was proper.

## VII.
### SUMMARY DISMISSAL OF CLAIMS AGAINST GENESIS OF JACKSON, INC.

Life Care appeals the summary dismissal of Plaintiff's cause of action against Genesis. It contends the record contained sufficient evidence to create a dispute of material facts to defeat Genesis' Motion for Summary Judgment.

Plaintiff contended in pertinent part in Count I:

36. On or about August 14, 1998, James Johnson was admitted to defendant [Life Care] nursing home. At the time of his admission, defendants knew that Mr. Johnson had a previous history of violence including severely beating a previous nursing home resident. In fact, the previous nursing home refused to readmit Mr. Johnson.

37. Through his stay, Mr. Johnson displayed aggressive and delusional behavior that put defendants on notice that he represented a serious threat of injury to residents. Medical records of Mr. Johnson reflect numerous instances of inappropriate and aggressive sexual and physical behavior. Staff assessments indicate that he was combative and swinging at the staff. On March 15, 1999, the staff noted that he was becoming more combative.

38. Given Mr. Johnson's medical history, the facility had a duty to evaluate Mr. Johnson prior to admission, and not accept him unless they were able to meet his total care needs, and protect the residents in the nursing home from his potentially disruptive and violent behavior.

39.  Despite Mr. Johnson's aggressive behavior, defendant Life Care admitted him into the facility and thereafter failed to provide him with the necessary care that he needed to keep his violent and aggressive behavior under control.  Defendant Life Care, through their staff, failed to keep Mr. Johnson's and Mrs. Stinson's medical providers adequately informed of changes in their conditions, including agitation and aggression.

40.  Defendant Life Care and their agents/employees breached applicable common law and statutory duties in managing and treating Mr. Johnson's aggressive behavior, and in preventing his aggressive behavior from causing injury to Martha Stinson.
. . . .

50.  Genesis . . . was at all pertinent times herein a provider of psychological and/or psychiatric services to residents at [Life Care].

51. [Life Care] has indicated in their pleadings that while they deny any responsibility for the injuries to Mrs. Stinson, if any party is responsible, it is either [Genesis] or the State of Tennessee. . . .   [Life Care] has alleged that Genesis . . . was providing psychological and related services to Mr. Johnson in an effort to monitor his behavior. [Life Care] has further alleged that [Genesis] through acts or omissions caused or contributed to Mr. Johnson's aggressive behavior.

52.   Based on the allegations made by [Life Care] against [Genesis], and assuming the truth of those allegations, *[Genesis] breached applicable standards of care in the treatment and monitoring of James Johnson which caused or contributed to the injuries sustained by Martha Stinson on January 1, 2000.*  (emphasis added)

Genesis denied liability in its Answer to the Amended Complaint.  Following discovery, Genesis moved to summarily dismiss Plaintiff's cause of action against it contending that it had at all times adhered to the applicable standard of care.  The trial court granted the motion and dismissed Genesis, finding there was not sufficient expert testimony in the record to establish the applicable standard of care, that Genesis breached the standard of care, or that any such breach caused injuries to the plaintiff which would not otherwise have occurred.[13]

When reviewing a challenged summary dismissal, we must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter*, 955 S.W.2d at 50-51.  If a factual dispute exists, we determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd*, 847 S.W.2d at 214; *Rutherford*, 978 S.W.2d at 104.  As part of our analysis of the facts, we must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, discard all countervailing evidence, and, if there is a

---

[13]The order dismissing Genesis was entered on March 6, 2003.

dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Godfrey*, 90 S.W.3d at 695; *Byrd*, 847 S.W.2d at 210; *EVCO Corp.*, 528 S.W.2d 20.

Summary judgments are not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. The party seeking a summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that party is entitled to judgment as a matter of law. *Godfrey*, 90 S.W.3d at 695.

The gravamen of Plaintiff's claims that survive[14] contend that Genesis breached applicable standards of care relative to the decision to admit Mr. Johnson as a resident, the medical and psychiatric treatment of Mr. Johnson while a resident, and monitoring whether Mr. Johnson should have been discharged as a resident. The Plaintiff's surviving claims do not relate to the medical and psychiatric care Genesis provided to or for Mrs. Stinson on whose behalf this action is brought.

It is undisputed that Genesis is a medical group that renders psychiatric and medical care. It is also undisputed that Life Care contracted with Genesis to: (1) conduct pre-admission evaluation of applicants to determine whether the applicant was appropriate for placement at Life Care; (2) provide psychiatric and medical care to residents of Life Care as Genesis's psychiatrists and physicians deemed appropriate; and (3) to monitor the residents to determine whether they were still appropriately placed and whether special care, medication or restrictions were appropriate.

Life Care opposed Genesis' Motion for Summary Judgment. It relied primarily on the affidavit of Vanderbilt Geriatric Physician, Dr. James Powers who stated that Genesis had the duty to (1) perform mental assessments of Mr. Johnson, (2) evaluate whether he was appropriate for admission and retention at Life Care, (3) advise Life Care if Mr. Johnson was not appropriately admitted, (4) make recommendations for discharge if required based upon his behavior, and (5) make recommendations regarding whether he should be allowed to interact with other residents. Dr. Powers also testified that Genesis had the duty to make recommendations necessary for special services for Mr. Johnson should he need a higher level of care for his mental health. Dr. Powers additionally testified that Life Care relied upon Genesis to provide the necessary treatment for Mr. Johnson's mental health needs, and for a determination of whether Mr. Johnson should have been separated from other residents or discharged to a more appropriate facility.

Life Care additionally relied on the affidavit of Dr. Powers to establish that Genesis deviated from the applicable standard of care. Dr. Powers opined that Genesis, and in particular its professional employees, Dr. Sherwin Yaffe and/or Dr. Cheri Premeau, had a duty to review all information in Mr. Johnson's medical records and failure to do so constitutes a deviation from the

[14]As we have previously discussed and concluded, the trial court properly dismissed Plaintiff's claims that do not relate to the assault on January 1, 2000. Plaintiff's claims that were properly dismissed include those relating to the care and treatment of Mrs. Stinson prior to January 1, 2000, as distinguished from claims that relate to the admission and retention of Mr. Johnson as a resident, and whether he was properly treated, medicated and restrained.

standard of care. Life Care also relied on the testimony of Plaintiff's expert witnesses, who opined that the records concerning MR. Johnson provided more than sufficient evidence to establish that Mr. Johnson should have been discharged from the facility prior to January 1, 2000.

We have concluded the affidavits of Dr. Powers and Plaintiff's experts, along with other evidence in the record, created a genuine dispute of facts material to Plaintiff's claims against Genesis.[15] Accordingly, we reverse the summary dismissal of Plaintiff's claims against Genesis.

Following the coattails of Genesis, Life Care filed a motion to summarily dismiss Plaintiff's claim against it pertaining to the admission and retention of Mr. Johnson. The sole basis of Life Care's appeal of this issue hinged on the summary dismissal of Genesis. Life Care contended that if the trial court properly dismissed Plaintiff's claim against Genesis, the similar claim against Life Care should have been dismissed. Our ruling on Genesis' Motion for Summary Judgment makes this argument moot. Moreover, we find material facts were in dispute, and thus summary dismissal was not appropriate. Accordingly, we find no error with the trial court's denial of Life Care's Motion for Summary Judgment on this issue.

## VIII.
### NECESSITY TO VACATE JUDGMENT AND REQUIRE TRIAL OF ISSUES IN ONE ACTION

As discussed above, Life Care insisted that the summary dismissal of Plaintiff's claims against Genesis, and thus Life Care's affirmative defense relative to the alleged acts and omissions of Genesis, prevented Life Care from shifting part or all of the fault on to Genesis. Since we have decided Plaintiff's claims against Genesis should not have been summarily dismissed, we are now presented with the thorny issue of whether to vacate the judgment against Life Care in order to afford a trial, one trial, of Plaintiff's claims against Life Care, along with Plaintiff's claims and Life Care's assertions of comparative fault against Genesis. We have concluded the rulings and rationale set forth in *Samuelson v. McMurtry*, 962 S.W.2d 473 (Tenn. 1998), and *Ridings v. Ralph M. Parsons Co.*, 914 S.W.2d 79 (Tenn. 1996), necessitate a new trial of all claims in one action.

The issue presented pertains to allegations of separate, independent negligent acts of more than one tortfeasor which allegedly combined to cause a single, indivisible injury. In such situations, the Tennessee Supreme Court has stated there should be one trial. *See Samuelson*, 962 S.W.2d at

---

[15]Historically, medical malpractice actions were limited to actions by patients against their healthcare providers. *See Dunbar v. Strimas*, 632 S.W.2d 558, 562 (Tenn. Ct. App. 1981); *see also Osborne v. Frazor*, 425 S.W.2d 768 (Tenn. Ct. App. 1968) (holding before a suit for medical malpractice will lie against a physician, there must be a physician-patient relationship). The limitation requiring a patient-physician relationship, however, took a dramatic turn with *Turner v. Jordan*, 957 S.W.2d 815 (Tenn. 1997). In *Turner* the Court held that the psychiatrist owed a duty of care to a non-patient third party because the psychiatrist knew or should have known that his patient posed an unreasonable risk of harm to a foreseeable, readily identifiable third party. *Id*. at 816. The Court went on to comment that the factors it typically balanced in determining whether a duty exists were: "the foreseeability and severity of potential harm; the nature of the defendant's conduct; and the availability, safety and effectiveness of alternatives." *Turner*, 957 S.W.2d at 820 (citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).

476; *see also Ridings*, 914 S.W.2d at 83-84.  The ability to require the trial in one action of issues that pertain to allegations of separate, independent negligent acts of more than one tortfeasor is assured by Tenn. R. Civ. P. 8.03.  The rule requires that "comparative fault (including the identity or description of any other alleged tortfeasors)" be pled as an affirmative defense.  *Ridings*, 914 S.W.2d at 83-84.

"The goals of efficiency and fairness are thus served by joining as defendants all persons against whom the plaintiff can assert a cause of action. *Ridings*, 914 S.W.2d at 84 (citing *John Scott Hickman, Note, Efficiency, Fairness, and Common Sense: The Case for One Action as to Percentage of Fault in Comparative Negligence Jurisdictions That Have Abolished or Modified Joint and Several Liability*, 48 Vand. L. Rev. 739 (1995)).

As the Court explained in *Samuelson*, one trial in matters involving allegations of separate, independent negligent acts of more than one tortfeasor which allegedly combined to cause a single, indivisible injury is necessary "to facilitate the participation of all potentially responsible persons so there can be one fuller and fairer presentation of the relevant evidence and to enable the jury to make a more informed and complete determination of liability." *Samuelson,* 962 S.W.2d at 475.  The plaintiff brought an action against two health care providers, contending they were responsible for death due to their failing to diagnose pneumonia.  The *Samuelson* complaint alleged that the separate and independent acts of Dr. Totty combined with the separate and independent acts of the other defendants to caused a single, indivisible injury.[16]  The trial court, at the request of the plaintiff, severed for trial the claim against Dr. Totty from the claim against Dr. McMurtry, necessitating two separate trials.  The Supreme Court found the severance of the claims, requiring two separate trials, was in conflict with principles of comparative fault.[17]  *Id*.

---

[16]On July 21, 1988, the deceased was treated by Dr. Holland, a physician, at an HCA hospital for a boil. The next day, Samuelson returned to the hospital with a fever and inflammation around the boil and was treated by Dr. McMurtry, a physician. Eight days later, on July 30, Samuelson went to the hospital emergency room with complaints of back pain, for which he was treated by Dr. McMurtry. The following day, July 31, he twice returned to the emergency room with the same symptoms. On his first visit, he was seen by Dr. Holland, but on his second visit he was discouraged by the hospital personnel from seeing a physician. On August 1, he went to the office of Dr. Totty, a chiropractor, with complaints of intense back and chest pain and was treated twice that day by Dr. Totty. The next day, Samuelson died from pneumonia, which had not been diagnosed by any of the health care providers. Expert medical evidence showed that the chest and back pain were caused by pneumonia and that the deceased's condition could have been treated successfully within 6 to 12 hours prior to his death.

[17]In its analysis, the *Samuelson* Court also discussed the role of Tenn. R. Civ. P. 19.02, which provides, "[a] person who is subject to the jurisdiction of the court shall be joined as a party if (1) in the person's absence complete relief cannot be accorded among those already parties. . . ."  The Supreme Court found the rule compelled the joinder of Dr. Totty, "because complete relief in this action, which is governed by comparative fault, could not be accorded all parties unless Dr. Totty was a party." *Samuelson*, 962 S.W.2d at 475. The Court noted, however, that although the rule contained the provision that it should be construed "to allow joint tort-feasors and obligors on obligations that are joint and several to be sued either jointly or severally" the application of the rule had "been affected by the adoption of comparative fault." *Id*.

> The procedure required under Tennessee's comparative fault formulation retains the efficiency of joint liability and the fairness of comparative fault. It also conserves judicial resources and eliminates inconsistent judgments. It resolves fairly the competing interests of full recovery for the plaintiff and the equitable allocation of liability for the defendants. Allowing a plaintiff to sue defendants in separate, consecutive actions would defeat the efficiency and fairness that are the objectives of the principles of comparative fault. *See John Scott Hickman, One-Action Rule*, 48 Vand. L.Rev. 739, 762 (1995).

*Samuelson*, 962 S.W.2d at 475. The *Samuelson* Court concluded the trial court erred in dismissing and severing the claim against Dr. Totty, that doing so "deprived the plaintiff of the right to proceed against the defendant Totty in the same trial with the other defendants and also of the right to have the decedent's fault compared with the fault of all the defendants" and the defendants other than Dr. Totty "were deprived of an opportunity to have fault apportioned against Dr. Totty." *Id*.

We find it significant that the Supreme Court in *Samuelson* went on to explain the result could be accomplished by a remand for a new trial. *Id*. at 475-76. Based upon the clear and compelling reasoning in *Samuelson* and *Riding*, we find the dismissal of Plaintiff's claim against Genesis prevented both Plaintiff and Life Care from resolving in one action the comparative rights and responsibilities of the parties, thereby necessitating a separate trial of those issues if the jury verdict in this matter is not vacated. We have therefore concluded that the proper course is to vacate the verdict against Life Care and to remand all surviving issues for trial in one action.

## IX.
### ASSESSMENT OF COSTS

The prevailing party may recover costs included in the bill of costs prepared by the clerk. Tenn. R. Civ. P. 54.04(1). In addition thereto, the trial court, in its discretion, may award additional costs, known as discretionary costs.[18] Tenn R. Civ. P. 54.04(2). Since we have vacated the verdict and remanded the surviving issue for a new trial, there is no prevailing party. There being no prevailing party, neither party is entitled to recover discretionary costs pursuant to Tenn. R. Civ. P. 54.04. Therefore, we vacate the award of costs against Life Care.

---

[18]The term "discretionary costs" gets its name from the fact they are allowable only in the trial court's discretion; however, the trial court's discretion is limited to costs identified in Tenn. R. Civ. P. 54.04(2). The Rule permits the recovery of "reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs." *Id*. The trial court does not have the discretion to assess costs other than those identified in Tenn. R. Civ. P. 54.04(2).

# X.
## THE REMAINING ISSUES

Because we have vacated the judgment against Life Care, we could decline to discuss the remaining issues; however, in the interest of judicial economy and to aid the parties and the trial court to reduce the issues on remand, we will discuss the remaining issues presented.

## A.
### EXCLUSION OF EVIDENCE

Plaintiff appeals numerous evidentiary rulings by the trial court. Specifically, Plaintiff challenges the trial court's exclusion of: (1) a statement attributed to a nurse's aide, Amber Gandy; (2) Mr. Johnson's records from the Middle Tennessee Mental Health Institute; (3) evidence of regulatory violations assessed by the Department of Health; and (4) evidence regarding alleged neglect of Mrs. Stinson over a period of months prior to the assault by Mr. Johnson.[19]

Decisions regarding the admissibility of evidence are within the discretion of the trial court. Tenn. R. Evid. 104(a). "When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1993) (citing *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832 (Tenn. Ct. App. 1980); Tenn. R. Evid. 401; *Austin v. City of Memphis*, 684 S.W.2d 624 (Tenn. Ct. App. 1984); *Inman v. Aluminum Co. of America*, 697 S.W.2d 350 (Tenn. Ct. App. 1985)). Moreover, error may not be predicated upon a ruling on the admissibility of evidence unless a substantial right of the complaining party is affected. Tenn. R. Evid. 103.

Plaintiff sought to introduce an alleged statement by a nurse's aide, Amber Gandy, through the testimony of Bessie Shepard, who was visiting when the assault occurred. In her deposition, Mrs. Shepard testified that she witnessed Mr. Johnson drop a piece of paper on the ground, and when Mrs. Shepard suggested to a person she believed to be Mrs. Gandy that she pick up the paper, Mrs. Gandy allegedly responded that she was afraid Mr. Johnson might hit her. Mrs. Shepard, however, went on to state she was not certain who that person was. Mrs. Shepard stated she believed the person was a nurse's aide, and she thought that person was named Gandy, but she was not certain. Ms. Gandy also testified by deposition and denied making such a statement. Following a hearing on the Motion in Limine, the trial court found Ms. Shepard's testimony to be unreliable hearsay and also found it did not fall within the excited utterance or notice exception to hearsay. Accordingly, the Motion in Limine was granted and the evidence excluded.

---

[19] Our holdings pertaining to these evidentiary matters apply only to the cause of action that was being tried when these matters were decided. Thus, we are not speaking to whether any of this evidence would be admissible in a subsequent trial for claims under TAPA.

Plaintiff made a host of arguments why the statement attributed to Ms. Gandy was admissible and the exclusion of the statement was reversible error. Our rules of evidence, however, provide that the court is vested with the authority to answer these preliminary questions concerning the admissibility of evidence, *see State v. Edison*, No. 03C019605CC00199, 1997 WL 1526501, at *5 (Tenn. Crim. App. June 18, 1997) (citing Tenn. R. Evid. 104(a)), and none of Plaintiff's arguments are sufficient to overturn the trial court's discretionary ruling.

The trial court also excluded on hearsay grounds records at MTMHI that suggested Mr. Johnson, while a resident at Life Care, had been engaged in conflicts and/or combative behavior prior to the assault on Mrs. Stinson. The MTMHI records, which were prepared following the attack on Mrs. Stinson and Mr. Johnson's discharge from Life Care, noted that Mr. Johnson had hit four staff members at Life Care Health Care Center. The notes further mentioned incidences of Mr. Johnson striking out at residents. The source of that information, however, was not reported in the MTMHI records. The trial court found the information in MTMHI's records unreliable and therefore inadmissible hearsay. The court also found the information was substantially more prejudicial than probative, citing Tenn. R. Evid. 403.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tenn. R. Evid. 403. As the trial court found, not all relevant evidence is admissible. *Otis*, 850 S.W.2d at 443 (citing *McCormack v. Riley*, 576 S.W.2d 358, 360 (Tenn. Ct. App. 1978)). The trial court has the discretion to exclude unreliable evidence and to exclude relevant evidence when the prejudicial effect outweighs its probative value. Finding no indication the trial court abused its discretion, we affirm the decision to exclude the MTMHI records.

The trial court also excluded evidence concerning deficiencies in the standard of care found by the Tennessee Department of Health. The trial court determined the deficiencies were not relevant to the issue of whether Life Care was responsible for the assault by Mr. Johnson. "Relevant evidence" is evidence having a tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tenn. R. Evid. 401. Evidence which is not relevant is not admissible. Tenn. R. Evid. 402. We find no error with the decision to exclude the records from the Tennessee Department of Health.

Evidence regarding alleged neglect of Mrs. Stinson over a period of months prior to the assault by Mr. Johnson was also excluded. Prior to the trial, the trial court entertained a three-hour hearing on a Motion for Summary Judgment that addressed, in part, allegations that Life Care neglected Mrs. Stinson by not maintaining proper hygiene, failing to appropriately administer psychotropic medications, and failing to appropriately supervise her to prevent elopments from the facility. Following the hearing, the court found Plaintiff had failed to show how the alleged omissions were relevant to the assault. The trial court's decision was subjected to three subsequent challenges during other hearings. A Motion to Reconsider was filed and denied. The exclusion of

the evidence was again reconsidered following a second Motion to Reconsider.[20]  At the pre-trial hearing on the parties' respective Motions in Limine, Plaintiff again requested permission to introduce this evidence, and the trial court, for the fourth time, held it inadmissible absent a showing of relevance to the assault by Mr. Johnson on January 1, 2000.  Finding no error with this discretionary decision, we affirm.

## B.
### PLAINTIFF'S EXPERT WITNESSES

Life Care contends the trial court erred by admitting into evidence the testimony of Plaintiff's three expert witnesses.  It contends the experts failed to satisfy the locality rule. Tenn. Code Ann. § 29-26-115.

The trial court has broad discretion in determining the qualifications of expert witnesses. *Mabon v. Jackson-Madison County Gen. Hosp.*, 968 S.W.2d 826, 829 (Tenn. Ct. App. 1997) (citing *Shelby County v. Barden*, 527 S.W.2d 124, 131 (Tenn.1975)).  Moreover, the Tennessee Supreme Court has directed that we "should allow discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness." *Mercer v. Vanderbilt Univ., Inc*., 134 S.W.3d 121, 133 (Tenn. 2004) (citing *White,* 21 S.W.3d at 223).

In a medical malpractice action, a plaintiff must establish by expert testimony the "recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community." Tenn. Code Ann. § 29-26-115(a)(1).  Our courts have consistently applied this rule, the so-called "locality rule," in medical malpractice actions to require proof "the defendant failed to act with ordinary and reasonable care when compared to the customs or practices of physicians from a particular geographic region." *Sutphin*, 720 S.W.2d at 457. The locality rule for expert testimony also applies with respect to professional negligence claims. *Martin v. Barge*, 894 S.W.2d 750, 751 (Tenn. Ct. App. 1994) (citing *Dooley v. Everett*, 805 S.W.2d 380 (Tenn. Ct. App. 1991)).  In *Martin*, which involved an engineering firm, this court stated, "Tennessee courts have adopted the "same or similar community" standard of care with respect to professional negligence." *Id*.

The locality rule is two-pronged.  The party calling an expert witness has the burden to establish the appropriate standard of care in (1) the community in which the defendant practices, or (2) a community similar to the one in which the defendant practices. *Mabon*, 968 S.W.2d at 831. Thus, the party's expert must be knowledgeable of one or the other to be competent to testify. Tenn. Code Ann. § 29-26-115(a)(1); *Robinson v. LeCorps*, 83 S.W.3d 718, 724 (Tenn. 2002).

The three experts called to testify were Dr. Jonathan Klein, Nurse Stephanie Zeman, and Nurse Administrator Judy Britt.  We will first address the qualifications of Dr. Klein and Nurse Zeman.  Having reviewed the deposition and trial testimony of Dr. Klein and Nurse Zeman, we see

---

[20]This motion was entertained by a different trial judge.

that they had significant expertise in geriatric medicine and nursing home protocol in rural communities, and they were sufficiently knowledgeable about the relevant information concerning the geographic region around Centerville, Tennessee and health care center protocols in that region. Applying the abuse of discretion standard, we find no error with the trial court's decision to admit their testimony into evidence.

As for Plaintiff's third expert, Administrator Judy Britt, we find no error with the decision to overrule Life Care's objection to the testimony of Administrator Britt. Our decision is based on the fact that: (1) nursing home administrators must be licensed under Tenn. Code Ann. § 63-16-101-115; (2) expert testimony regarding a nursing home administrator must comply with Tenn. Code Ann. § 63-16-115(b) because the administrator is a "person in the healthcare profession requiring licensure"; and (3) Ms. Britt satisfied the requirement of the locality rule.

## C.
### MOTION IN LIMINE TO EXCLUDE EVIDENCE OF PLAINTIFF'S CLAIM AGAINST THE STATE

The trial court granted Plaintiff's Motion in Limine to prevent Life Care from introducing into evidence pleadings concerning Plaintiff's claim against the State. Life Care contends this was error. It was not.

We review discretionary decisions by the trial court, such as the admission and exclusion of evidence based upon the abuse of discretion standard. *Mercer*, 134 S.W.3d at 133. Pursuant to that standard, discretionary decisions by the trial court are to stand even though reasonable judicial minds can differ concerning their soundness." *Mercer,* 134 S.W.3d at 133 (citing *White*, 21 S.W.3d at 223).

The issue presented is substantially similar to that presented in *Patterson ex rel. Patterson v. Dunn*, No. 02A01-9710-CV-00256, 1999 WL 398083 (Tenn. Ct. App. June 16, 1999). In *Patterson*, the Teague defendants contended the jury was entitled to know the plaintiff's allegations against a defendant [Dunn] that was no longer a party to the suit. The plaintiff asserted the complaint against the the former defendants [the Dunns] was inadmissible as evidence or for impeachment purposes because it contained only conclusory allegations that were not substantive evidence. The plaintiff relied upon *Pankow v. Mitchell,* 737 S.W.2d 293, 296 (Tenn. Ct. App. 1987) for the proposition that "pleadings are only admissible if they are allegations of fact." *Patterson*, 1999 WL 398083, at *8. The trial court sided with the plaintiff.

This court's analysis in *Patterson* included a discussion of *Branch v. McCroskey*, No. 03A01-9709-CV-00385, 1998 WL 47873, (Tenn. Ct. App. Feb.5, 1998), wherein the plaintiff sought to introduce into evidence allegations the defendant made in a cross claim against the cross defendant. The substance of these allegations was "[t]hat while in the sole possession, custody and control of the [cross defendant], one (1) of the [defendant's] two (2) horses suffered serious injuries which were proximately caused by the negligence of the [cross defendants]." *Patterson,* 1999 WL 398083, at *8 (citing *Branch*, 1998 WL 47873, at *4). The *Branch* court held that the allegations

in the cross claim were not admissions of fact, merely conclusory statements, and thus not admissible as evidence or for impeachment.

> The modern equivalent of the common law system is the use of alternative and hypothetical forms of statement of claims and defenses, regardless of consistency. It can readily be appreciated that pleadings of this nature are directed primarily to giving notice and lack the essential character of an admission. To allow them to operate as admissions would render their use ineffective and frustrate their underlying purpose. Hence the decisions with seeming unanimity deny them status as judicial admissions, and generally disallow them as evidential admissions.

*Lytle v. Stearns*, 830 P.2d 1197, 1207 (Kan. 1992) (quoting MCCORMICK ON EVIDENCE § 265, 781-82).

Factual statements contained in pleadings may be considered as admissions. *Patterson*, 1999 WL 398083, at *8 (citing *Pankow*, 737 S.W.2d at 296); *see also First Tenn. Bank v. Mungan*, 779 S.W.2d 798, 801 (Tenn. Ct. App. 1989). Admissions of fact are admissible against the party making them "both as substantive evidence and for the purpose of impeachment." *Pankow*, 737 S.W.2d at 296. The pleadings Life Care sought to introduce, however, did not constitute factual statements or admissions of fact. We therefore find no error with the granting of the Motion in Limine.

## XI.
### IN CONCLUSION

We affirm the dismissal of Plaintiff's TAPA claims set forth in Count IV of the proposed Second Amended Complaint.

We affirm the summary dismissal of Plaintiff's claims based on federal regulations.

We affirm the trial court's discretionary decision permitting Life Care to amend its Answer to assert a claim against the State as an alleged comparative fault tortfeasor.

We vacate the summary dismissal of Plaintiff's claims against Genesis and the judgment against Life Care, and remand for a new trial all of Plaintiff's surviving claims against Life Care and Genesis.

We vacate the award of costs against Life Care.

We affirm the trial court's decision to exclude the unreliable hearsay statements attributed to Ms Gandy. We also affirm the exclusion of the MTMHI records, the regulatory violations assessed by the Department of Health, and evidence of alleged neglect of Mrs. Stinson over a period of months prior to the assault.

We affirm the decision to admit into evidence the testimony of Dr. Jonathan Klein, Nurse Stephanie Zeman, and Nurse Administrator Judy Britt.

Costs of this appeal are assessed equally against Plaintiff and Life Care.

_____
FRANK G. CLEMENT, JR., JUDGE