# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 19, 2011 Session

## CATHY VICE, ET AL. v. ELMCROFT OF HENDERSONVILLE, ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 2008-CV-32073      C. L. Rogers, Judge**

**No. M2010-01148-COA-R3-CV - Filed August 22, 2011**

The daughter of an eighty-seven year old woman was looking for an assisted living facility for her mother, who was suffering from dementia. Elmcroft of Hendersonville assured the daughter that it could care for her mother and admitted her after the daughter informed it of her concern about her mother's risk for falls. Three weeks following her admission the mother fell, and then fell three more times before the daughter moved her out of Elmcroft. The final fall resulted in a broken clavicle, which caused the mother pain and decreased mobility for the rest of her life. The daughter, as her mother's representative, sued Elmcroft and its administrator for negligence and negligent admission and retention of her mother. A jury awarded a judgment against the defendants for $250,000. There was evidence the Elmcroft staff did not follow Elmcroft's fall prevention policies and procedures. Elmcroft argued that all claims filed against it involved matters of medical science or art requiring specialized skills not ordinarily possessed by lay persons, and, therefore, this was a medical malpractice which should have been dismissed since the statutory requirements for such a claim had not been met. We conclude, based on the evidence herein, that the claims were ordinary negligence claims. Elmcroft also argued (1) the trial court erred in refusing to instruct the jury on the negligence of the daughter and a physician from another state who indicated the mother may be cared for by an assisted living facility and (2) that the jury award was excessive, contained a punitive component, and was the result of passion, prejudice and caprice. We conclude the court did not err in refusing to charge the jury on the physician's comparative fault or the daughter's comparative negligence. We also conclude there was material evidence to support the jury's award of damages. Consequently, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Steven H. Trent, Chad E. Wallace, Christie M. Hayes, Johnson City, Tennessee, for the appellants, Elmcroft of Hendersonville; Senior Care, Inc.; AL Hendersonville Operations, LLC; and Lisa Harrison.

James B. McHugh, Michael J. Fuller, Amy J. Quezon, D. Bryant Chaffin, Hattiesburg, Mississippi, for the appellee, Cathy Vice, as daughter and Administratrix of the Estate of Julia C. Bynum a/k/a Juliet J. Bynum.

## OPINION

This case centers around whether or not the assisted living facility known as Elmcroft of Hendersonville, together with its related entities Senior Care, Inc. and AL Hendersonville Operations, LLC (all entities will be referred to as "Elmcroft"), and its administrator, Lisa Harrison, were negligent in their care of Julia C. Bynum while she was a resident at Elmcroft. The case was tried before a jury, which found Elmcroft and Ms. Harrison negligent and awarded damages to Ms. Bynum's administratrix, Cathy Vice, in the amount of $250,000. Elmcroft appeals the trial court's judgment accepting the jury verdict and entering it as an order, alleging the trial court erred in a variety of ways. For the reasons set forth below, we affirm the trial court's judgment in all respects.

### I. EVIDENCE INTRODUCED AT TRIAL

#### A. The Decision to Move Ms. Bynum to Elmcroft

Ms. Bynum was eighty-seven years old when her daughter Cathy Vice and granddaughter Celena Nance began looking for an assisted living facility for her that was near Ms. Nance's house in White House, Tennessee. Ms. Bynum had been diagnosed with dementia in 2005 and required more care than her daughter or granddaughter could provide on their own. Ms. Bynum spent some time at a nursing home in Mississippi called Pine Meadows, near Ms. Vice's house, but Ms. Vice and Ms. Nance wanted to move her to a facility closer to Ms. Nance's residence in middle Tennessee.

Ms. Vice and Ms. Nance testified they wanted a facility where Ms. Bynum could move around on her own and be as independent as possible. When she first considered moving her mother into Elmcroft, Ms. Vice met with Nelda Rapp, the community relations director. Ms. Rapp was in charge of marketing Elmcroft to doctors and agencies, and she was the one who led families on tours of the facility. Ms. Rapp's job included meeting with families who were considering moving a family member into Elmcroft to answer questions about the Elmcroft facility and what it provided. She did not have any medical training.

Lisa Harrison was the administrator of Elmcroft, and she was responsible for determining if a potential resident was appropriate to be admitted into Elmcroft. She testified that she normally relied on the recommendation of the nurse who conducted the resident's assessment in making this determination. She also testified it was her responsibility to determine whether a current resident should continue to live at Elmcroft if the resident's needs increased over time to the point that Elmcroft was not able to

2

provide the requisite level of care to that individual. Finally, Ms. Harrison was responsible for determining the appropriate staffing level at Elmcroft based on the needs of the residents.

Ms. Harrison testified that she was not involved with Ms. Bynum's admission. She explained that the community relations director, Ms. Rapp, completed Ms. Bynum's admission paperwork. Vanessa Wilson, who was a licensed practical nurse at Elmcroft, conducted the pre-admission resident level of care assessment for Ms. Bynum a couple of weeks before Ms. Bynum moved into Elmcroft, while Ms. Bynum was still at Pine Meadows. Ms. Wilson conducted the assessment over the telephone with someone at Pine Meadows who apparently told Ms. Wilson that Ms. Bynum had not experienced any falls while at Pine Meadows.[1] Other than the pre-admission assessment Ms. Wilson conducted over the telephone, no other assessment was done to determine whether Ms. Bynum was in fact an appropriate resident for Elmcroft before Ms. Bynum was admitted to Elmcroft on December 1, 2007.

Elmcroft has two separate living spaces for its residents: an assisted care side and an Alzheimer's side called Heartland Village. Ms. Vice knew her mother had fallen while she was at Pine Meadows, and she testified that she told Ms. Rapp her main concern was her mother's risk for falls. Ms. Rapp assured Ms. Vice her mother would be well cared for at Elmcroft. Ms. Vice thought her mother should be placed in the Heartland Village side because she had been diagnosed with Alzheimer's, but Ms. Rapp convinced Ms. Vice that her mother would be better off on the assisted care side.

Ms. Rapp testified she had a financial incentive to admit residents into Elmcroft, and that both she and Lisa Harrison received $400 for each individual they admitted to Elmcroft.

## B. Elmcroft's Policies and Procedures

Elmcroft had in place certain policies and procedures to address individual residents' fall risks. Upon admission to Elmcroft, the Elmcroft staff is supposed to assess each resident for his or her risk of falls by filling out Elmcroft's "Falls Screening Tool." The "Falls Screening Tool" indicates how many falls a resident has suffered in the last 90 days as well as the resident's level of mobility, vision, and overall health. This

---

[1] There was evidence, however, that a couple of weeks after this conversation, while she was still at Pine Meadows, Ms. Bynum fell on two separate occasions. Ms. Bynum suffered a softball sized lump to her head as the result of one of these falls. Notes of these falls were in Ms. Bynum's records from Pine Meadows, but there was no evidence that anyone at Elmcroft ever reviewed these notes or learned of these falls either prior to Ms. Bynum's admission into Elmcroft or after she moved in. If anyone at Elmcroft was aware of Ms. Bynum's falls at Pine Meadows, the evidence does not show that any action was taken to prevent future falls while Ms. Bynum was at Elmcroft.

assessment is to be performed again thirty days after admission, quarterly, and upon any change of condition. For any resident scoring a 4 or higher on the "Falls Screening Tool," the "Falls Prevention Tool" is supposed to be completed. This tool is used to determine the interventions the facility can put into place to lessen the risk of a resident's fall. The "Falls Prevention Program" clearly states: "Following any resident fall, the 'Falls Investigation Tool' must be used to help determine what caused the fall in order to reduce the risk of a future fall. This tool should be used for ANY resident fall, regardless of whether that resident is on the 'Falls Prevention Program.'"

The "Falls Investigation Tool" requires the Elmcroft employee filling out the form to determine to the extent possible whether environmental factors or healthcare factors led to the resident's fall, and to determine what can be done to lessen the risk of future falls. Environmental factors include such things as water spills, throw rugs, availability of grab bars, clutter on the floor, improper lighting, and phone or electrical cords in the resident's path. Environmental factors also include determining such things as whether the resident was in a hurry, whether the resident was using her ambulation device, whether she was tangled in clothing, or whether she was reaching for items when she fell. The section titled "Resident Healthcare Factors" asks whether the resident has had a change in her medication or blood pressure, whether she has recently returned from the hospital, whether she has suffered weight loss, whether she has recently had a fever or cough, and whether there was a change in her mental status, change in her mobility status, or change in her behavior when she fell. There is also a section in the "Falls Investigation Tool" for the employee to indicate whether the resident has had more than one fall, and if so, how many, whether the falls are similar in nature, what the resident was doing when she fell, what actions can be taken to reduce the resident's risk in the future, whether there is a need to reassess this resident, and whether there is a need to make a change to the resident's Care Plan.

Elmcroft also had a policy regarding "Incident Reporting." The stated policy for "Incident Reporting" was to report and file "incident reports on any incident which is unexpected, unintended, undesirable and/or departs from the routine behavior of a resident." The policy makes clear that an Incident Report should be filed whenever a resident "is involved in an unexpected event resulting in minor injury or no injury." As part of completing an incident report, Elmcroft employees were supposed to report the incident to the healthcare director or her designee, go to the location where the incident occurred, and protect the resident's safety and comfort. The employee was supposed to document all action taken, including where the resident was found, what sort of footwear she was wearing, the condition of the floor, and whether she was put back into bed.

If a resident suffers an acute adverse incident, such as a fall with a significant skin tear, the Health Care Director or her designee is supposed to initiate a 72-Hour Acute Monitoring Report. The 72-Hour Acute Monitoring Report is supposed to be kept in the front of the medication administration record for any resident who suffers an acute

4

adverse incident and filled out at least once per shift, more often as necessary. Resident aides who fill out the 72-Hour Acute Monitoring Report are supposed to identify any problems the resident is having, note any interventions taken, and evaluate the resident's condition. Issues or concerns related to the resident during the 72-hour time period are supposed to be communicated immediately to the health care director or her designee.

### C. Ms. Bynum's Falls at Elmcroft

When she was admitted to Elmcroft, the healthcare director assessed Ms. Bynum for her risk of falls. Ms. Bynum scored a 14 on the "Falls Screening Tool." The healthcare director noted on this form that Ms. Bynum had suffered no falls in the preceding 90 days, but that she depended on a device such as a walker to get around, was easily distracted, and was incontinent. Pursuant to Elmcroft's policy, since Ms. Bynum scored 4 or above on the "Falls Screening Tool," a "Falls Prevention Tool" was then completed for Ms. Bynum.[2] In accordance with Elmcroft's stated policy, Ms. Bynum was assessed again thirty days later using the "Falls Screening Tool." This time the healthcare director noted Ms. Bynum had fallen in the last 90 days, causing her to score an 18. Even though Ms. Bynum's score was higher than before, indicating a higher risk for falls, the "Falls Prevention Tool" was not completed at this time as it should have been based on Elmcroft's stated policy.

While she was at Elmcroft, Ms. Bynum fell on four separate occasions, December 23, 2007, and then again on January 5, 6, and 9, 2008. The fall on December 23 was noted in Ms. Bynum's "Progress Notes," where a resident aide wrote that Ms. Bynum was found on the floor with no apparent injuries. Elmcroft's policy is to complete a "Falls Investigation Tool" whenever a resident falls, but no "Falls Investigation Tool" or "Incident Report" was filled out after Ms. Bynum's fall on December 23.[3] As discussed, the purpose of the "Falls Investigation Tool" is to document exactly where the fall occurred, to determine what led to the fall, and what Elmcroft could do to prevent additional falls in the future.

Thirteen days following her fall on December 23, Ms. Bynum fell again on January 5, 2008. Ms. Bynum's "Progress Notes" reveal again that she was found on the floor with no injuries. As was the case following her fall on December 23, no one at Elmcroft filled out a "Falls Investigation Tool" to determine the cause of Ms. Bynum's fall on January 5 or to determine what could be done to reduce the chance of future falls.

---

[2] The healthcare director noted on this form that Ms. Bynum had issues with mobility and continence, and suggested Ms. Bynum's room be assessed for pathway obstructions, especially from the bed to the bathroom and from the bed to the door.

[3] While Elmcroft's policy does not specify that an "Incident Report" is to be prepared for each fall a resident suffers, a jury could reasonably find that Ms. Bynum's falls were "unexpected events," and that each fall warranted a separate "Incident Report."

Moreover, no one filled out an "Incident Report" following Ms. Bynum's fall on January 5.

The following day, January 6, Ms. Bynum fell again, but this time she suffered a skin tear on her right elbow as well as a large hematoma on the right side of her forehead. Ms. Bynum was sent to the emergency room following this fall, and an Incident Report was filled out as contemplated by Elmcroft's policy. However, no one at Elmcroft filled out the "Falls Investigation Tool" following Ms. Bynum's fall on January 6 or initiated the 72-Hour Acute Monitoring Report as Elmcroft's policy dictates.

By the time she fell on January 6, Ms. Bynum had been moved over to Heartland Village, the Alzheimer's side of Elmcroft. The supervisor/manager of Heartland Village testified that after Ms. Bynum returned from the hospital following her fall on January 6, the Elmcroft staff moved Ms. Bynum's mattress to the floor. The supervisor/manager testified that the resident aides were supposed to check on Ms. Bynum every hour, but the nurse's notes do not reflect that these hourly checks were actually performed.

Three days following her fall on January 6, Ms. Bynum fell again on January 9. Ms. Bynum's "Progress Notes" indicate she was found on the floor, and this time she suffered a hematoma to the left side of her forehead. The evidence showed Ms. Bynum complained of pain to her left shoulder following this fall. She again was taken to the emergency room, where Ms. Bynum was checked over and her left shoulder was x-rayed. The emergency room doctor did not notice a fracture at that time. Ms. Bynum's granddaughter, Celena Nance, took Ms. Bynum to her house from the hospital, and Ms. Bynum did not return to Elmcroft again.

Ms. Nance kept Ms. Bynum with her at her house for one night before transporting Ms. Bynum to Ms. Vice's house. Ms. Nance testified that Ms. Bynum shouted out in pain whenever she tried to move her left arm or when Ms. Nance or her husband tried to lift Ms. Bynum to move her from one place to another.

From Ms. Nance's house Ms. Bynum went directly to the home of her daughter, Cathy Vice. Ms. Vice testified that her mother could not move her left arm at all when she arrived at her house. When she continued to complain of pain in her left shoulder, Ms. Vice made an appointment for her mother to see a physician named Dr. Shaun Helmhout on January 16, seven days following her fall on January 9. Dr. Helmhout had Ms. Bynum's left shoulder and clavicle x-rayed, and this x-ray showed Ms. Bynum had a distal clavicle fracture that was displaced on the left side. Dr. Helmhout told Ms. Vice that no medical procedures were available to speed the healing of the fractured clavicle.

Ms. Vice wanted a second opinion because her mother was in so much pain, so on February 7, 2008 she took her mother to see Dr. Cooper Terry, an orthopedic surgeon. Dr. Terry ordered additional x-rays to be taken of Ms. Bynum's left clavicle and agreed with

6

Dr. Helmhout's diagnosis that Ms. Bynum had a distal clavicle fracture that was displaced. Dr. Terry confirmed that surgery was not an option to treat this fracture. Dr. Terry believed the best treatment was to immobilize the left arm in a sling to give Ms. Bynum the maximum comfort.

When he was asked to explain the initial x-ray's failure to show a fracture of Ms. Bynum's clavicle on January 9, Dr. Terry testified that the initial x-rays may not have been taken of Ms. Bynum's clavicle specifically, but of a different part of her shoulder that did not reveal the clavicle's fracture. Dr. Terry also testified that Ms. Bynum's fracture may have become displaced subsequent to the time her shoulder was x-rayed on January 9, and that the fracture may not have been obvious on the x-rays taken on January 9. Dr. Terry believed Ms. Bynum suffered the fracture approximately four weeks before he saw her on February 7 due to the amount of callus that had already formed around the fracture. Dr. Terry explained that the amount of callus surrounding the fracture indicated the fracture occurred three to four weeks earlier, but that he could not state with any certainty the exact date of the fracture.

Ms. Vice testified that her mother continued to suffer pain from the fractured clavicle and was unable to use her left arm for the remainder of her life. Ms. Bynum was moved to a hospice facility in March 2008 and passed away in May 2009.

## II. TRIAL COURT PROCEEDINGS

Ms. Vice filed a complaint in the capacity of "next friend" to her mother. After the death of Ms. Bynum, Ms. Vice proceeded as the Administratrix of Ms. Bynum's estate. The suit against Elmcroft and Ms. Harrison was filed in September 2008 and alleged ordinary negligence and medical malpractice, along with claims for breach of resident rights, malice and/or gross negligence, fraud, breach of fiduciary duty, premises liability, and violation of the Tennessee Consumer Protection Act. All claims other than the ordinary negligence claims were dismissed either by Ms. Vice or by the court before the case was sent to the jury. As a result, the only cause of action the jury was charged with deciding was ordinary negligence.

Following the close of evidence, Elmcroft and Ms. Harrison asked the trial court to instruct the jury on comparative fault, arguing that if the jury found them liable for negligence, the evidence showed that both Dr. Conerly and Ms. Vice were negligent as well.

Dr. Conerly was a physician who saw Ms. Bynum when she was living at Pine Meadows in Mississippi. There was evidence that Dr. Conerly signed a letter dated November 28, 2007, stating that Ms. Bynum did not need continuous skilled nursing care, and that "[b]ased on the type of care an assisted living care residence may provide, [Ms. Bynum's] needs may be met by this community." Dr. Conerly was not named or added

7

as a defendant in this case, he was not deposed by any party, and he did not testify during the trial. The trial court declined to instruct the jury on the comparative fault of Dr. Conerly, finding there was insufficient evidence to support any claims of negligence against him. As to Ms. Vice, the court agreed to instruct the jury on a plaintiff's obligation to mitigate damages, but declined to instruct on any negligence she may have engaged in.

The court instructed the jury on negligence, stating:

We start out with a mere fall alone does not raise a presumption of negligence. Just because somebody falls, you don't start out with, Well, somebody must have done something wrong or the defendant was negligent. Not so. So don't start out that way.

What is negligence? Under the law, it's the failure to use ordinary or reasonable care under the circumstances of this particular case. It's doing something that a reasonably careful person would not do or failing to do something a reasonably careful person would do.

. . . . .

Once you are - - or while you are looking at negligence, you may look at someone and say, Well, that was careless, but now we have to answer the second part of negligence: Causation.

Now, what do we mean by causation? A defendant's negligence would be conduct that is a cause in fact of the injury, that it directly contributed to the injury, and without it the plaintiff's injury would not have occurred. So that's what you're looking for when you deal with this causation issue.

I can be negligent and not cause injury, so don't stop at negligence. Go on to the causation situation.

The second part to causation really adds a little bit. That negligence must have been a substantial factor in bringing about the harm and the harm that occurred was reasonably foreseeable, that - - or it should have been reasonably foreseeable or anticipated, could happen.

. . . . .

Now, the last one I haven't discussed with you yet is damages. If you have gone through the process, you have found the defendant's

8

negligent and you have found the causation is there and you have found that the plaintiff has carried the burden to show the injury, then it's up to you to decide the issue of damages. There's no formula. There are no guidelines. . . . You are to determine a reasonable amount of damages that you think is fair in light of the evidence.

Now, here are the elements that you should consider in this case, of course. Medical expenses, goes without saying, cost of medical care, services and supplies that were required and actually given in this case. The law also allows a recovery for physical pain that a person actually suffers when they have been injured, and also when they have been injured the mental impact that it has on a person that is suffering from physical pain.

You are looking to make reasonable compensation for this pain, be it physical or mental. Mental pain obviously means someone that's been injured may have had anguish, grief, shame or worry. So those are some elements to look at.

You would then move to a third element and look at the permanency of the injury that the plaintiff received, if any, that means, was the injury permanent and the plaintiff would have to live with it for the rest of their life, resulting in inconvenience and things that go along with that.

Let's see. Loss of enjoyment of life. That is different than physical pain and your mental anguish or worry or - - or loss of enjoyment of life is the loss of the normal things and pleasures in life that you enjoyed before the injury and the new limitations on that lifestyle resulting from that injury.

Again, plaintiff is entitled to recover for these losses only if you find that the plaintiff has proven these by a preponderance of the evidence, that each was caused by the defendants' negligence.

The court also instructed the jury on the duty to mitigate damages as follows:

Now, an injured party who may have damages has the duty to mitigate damages by using reasonable diligence, reasonable care in taking care of that injury and also employing reasonable means to accomplish healing. If you find that a person did not use reasonable care in taking care of the injuries or they have aggravated the result by their failure to take care of the injuries, then you will adjust the damages accordingly, looking at that factor.

The jury returned a verdict for Ms. Bynum's estate, finding Elmcroft and Lisa Harrison negligent and awarding damages in the amount of $250,000. The jury completed a generalized verdict form and was not asked to specify for which claims it found the defendants liable, or how much it was awarding for Ms. Bynum's pain and suffering as opposed to compensatory damages, permanency of the injury, or loss of life enjoyment.

Elmcroft and Ms. Harrison filed a timely post-trial motion for judgment notwithstanding the verdict, for a new trial, or alternatively, for suggestion of a remittitur. The trial court issued an order denying the motions for a new trial and judgment notwithstanding the verdict. The court found the verdict amount to be "well within the range of reasonableness" and denied the request for remittitur. Elmcroft and Ms. Harrison duly filed a notice of appeal.

### III. ISSUES ON APPEAL

Elmcroft and Ms. Harrison raise several issues on appeal. First, they argue Ms. Vice's exclusive remedy should have been a medical malpractice claim because the acts and omissions she complained of involved matters of medical science or art requiring specialized skills not ordinarily possessed by lay persons. Next, they argue the trial court erred in refusing to instruct the jury on Dr. Conerly's and Ms. Vice's comparative fault and negligence, and not allowing the jury to apportion fault to these two individuals on the jury verdict form in the event the jury found Elmcroft and Ms. Harrison liable. Finally, Elmcroft and Ms. Harrison argue the court erred in failing to grant Elmcroft and Ms. Harrison's motion for judgment notwithstanding the verdict, motion for a new trial, or alternatively, for suggestion of a remittitur because the jury's verdict was excessive, was tainted with error or confusion, contained an impermissible punitive component, and was replete with passion, prejudice and caprice.

### IV. ANALYSIS

#### A. Standard of Review

The applicable standard of review of a jury verdict is set out in Tennessee Rule of Appellate Procedure 13(d), which provides, "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." As a practical matter this means:

[I]f there is material evidence to support the jury verdict, we "take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence."

10

*Barkes v. River Park Hospital*, 328 S.W.3d 829, 833 (Tenn. 2010) (quoting *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn.2006) (itself quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704–05 (Tenn.2000)).

### B. Ordinary Negligence Claims

We will first address Elmcroft and Ms. Harrison's argument that the trial court erred in failing to dismiss Ms. Vice's ordinary negligence claim. Elmcroft and Ms. Harrison argue Ms. Vice's complaint should have been limited to medical malpractice and should not have been submitted to the jury on ordinary negligence. Medical malpractice is a type of negligence, but involves damages resulting from negligent medical treatment. The Tennessee Supreme Court has explained the distinction as follows:

> [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Estate of French v. Stratford House*, 333 S.W.3d 546, 555 (Tenn. 2011) (quoting *Gunter v. Lab. Corp. of Am.*, 121 S.W.3d 636, 640 (Tenn. 2003)). A medical malpractice action is subject to a number of statutory requirements which this lawsuit did not meet. Among other requirements, a plaintiff must submit qualified expert testimony to prove specific elements of medical malpractice, whereas there is no need for expert testimony to prove ordinary negligence. Tenn. Code Ann. § 29-26-115.

In her complaint, Ms. Vice alleged Elmcroft and Ms. Harrison were negligent in admitting Ms. Bynum into Elmcroft and in retaining her there as her condition deteriorated and she fell more and more often. Ms. Vice also based her negligence claim on Elmcroft and Ms. Harrison's failure to provide adequate staff necessary to assist the residents with their needs; their failure to protect Ms. Bynum from harm; their failure to maintain appropriate records, including the failure to monitor and document significant changes in Ms. Bynum's condition; and their failure to implement and ensure that an adequate nursing care plan for Ms. Bynum was followed by the nursing personnel.

The issue of whether an action should be limited to a medical malpractice claim and proceed according to the dictates of the Tennessee Medical Malpractice Act, or whether the claim should proceed as an ordinary negligence claim, has received a lot of attention in recent years by the Tennessee appellate courts. The Tennessee Supreme Court has most recently addressed this issue in *Estate of French v. Stratford House*, 333 S.W.3d 546 (Tenn. 2011). The administratrix in that case filed a wrongful death action

against a nursing home, alleging damages as the result of ordinary negligence, negligence per sé, and violations of the Tennessee Adult Protection Act. *Id*. at 549. The nursing home moved for partial summary judgment on the ground that the Tennessee Medical Malpractice Act applied to the ordinary negligence claims, precluding the administratrix from pursuing the ordinary negligence claims. The trial court granted the nursing home partial summary judgment, and the Court of Appeals affirmed this judgment. *Id*. at 549-50. The administratrix appealed to the Tennessee Supreme Court, which reversed the lower courts' decisions because the administratrix had alleged violations of the standard of care relating to both medical treatment and routine care. *Id*. at 550. The Supreme Court wrote:

> If the alleged breach of the duty of care set forth in the complaint is one that was based upon medical art or science, training, or expertise, then it is a claim for medical malpractice. If, however, the act or omission complained of is one that requires no specialized skills, and could be assessed by the trier of fact based on ordinary everyday experiences, then the claim sounds in ordinary negligence.

*Id*. at 556 (citing *Conley v. Life Care Ctrs. of Am.*, 236 S.W.3d 713, 729-30 (Tenn. Ct. App. 2007)). The *Estate of French* court quoted with approval this court's distinction between medical malpractice claims and ordinary negligence claims as set forth in *Peete v. Shelby Cnty. Health Care Corp.*, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996). *Estate of French*, 333 S.W.3d at 556. As we explained in *Peete*:

> Medical malpractice cases typically involve a medical diagnosis, treatment or other scientific matters. The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact.

938 S.W.2d at 696 (quoting *Graniger v. Methodist Hosp. Healthcare Sys.*, 1994 WL 496781, at *3 (Tenn. Ct. App. Sept. 9, 1994)).

> In *Estate of French*, the Tennessee Supreme Court wrote:

> The [Tennessee Medical Malpractice Act] applies only to those alleged acts that bear a substantial relationship to the rendition of medical treatment by a medical professional, or concern medical art or science, training, or expertise.

*Estate of French*, 333 S.W.3d at 557. In *Estate of French*, the court determined that the following allegations would state a claim for medical malpractice: claims of negligence

12

in assessing an individual's condition, developing her initial plan of care, and properly updating that plan to conform to changes in her condition. *Id.* at 558. On the other hand, claims that the nursing home's certified nursing assistants ("CNAs") failed to administer basic care in compliance with both the established care plan and doctors' orders state a claim for ordinary negligence. *Id.* The court explained:

> While CNAs are required to receive a course of training that is regulated by the state, they are not medical professionals and their qualifications do not approach the more extensive and specialized training of a doctor or registered nurse. The Administratrix claims that the failure of the CNAs to provide basic services resulted, at least in part, from chronic understaffing of which senior management at the Stratford House was aware. In our assessment, these alleged acts and omissions pertain to basic care and do not substantially relate to the rendition of medical treatment by a medical professional. Because no specialized medical skill is required to perform those tasks, the trier of fact could assess the merits of the claim based upon everyday experiences.

*Id.*

### 1. Counts Against Ms. Harrison For Wrongful Admission And Retention

In this case, Ms. Vice complained of negligence by Ms. Harrison and Elmcroft's staff of residential assistants, also known as resident aides, ("RAs") and CNAs. The claims against Ms. Harrison were that she negligently determined Ms. Bynum was an appropriate resident for Elmcroft to begin with, and that Ms. Harrison was negligent in determining that Ms. Bynum should remain at Elmcroft after her falls on December 23, January 5, and January 6. Ms. Harrison confirmed that throughout Ms. Bynum's residency at Elmcroft she was responsible for determining whether a potential resident was appropriate to live at Elmcroft and for determining whether a current resident remained appropriate over time. Ms. Harrison testified she is not a medical professional and does not perform medical services.

Elmcroft and Ms. Harrison rely on *Conley v. Life Care Centers of America*, 236 S.W.3d 713 (Tenn. Ct. App. 2007), to support their argument that the decision to admit Ms. Bynum to Elmcroft and the decision to retain her there necessarily involved medical science or art requiring specialized skills. The individual at issue in *Conley* was admitted to a nursing home, not an assisted living facility. Nursing homes have stricter regulations for admission than assisted living facilities and require that "[e]very person admitted for care or treatment shall be under the supervision of a physician who holds a license in good standing to practice in Tennessee." Tenn. Comp. R. & Regs. §1200-8-6-.05(1). The regulations also require that "[a] diagnosis . . . be entered in the admission records of the nursing home for every person admitted for care or treatment." Tenn. Comp. R. &

13

Regs. §1200-8-6-.05(2). The regulations relating to nursing homes prohibit a resident from being discharged without a written order from the attending physician or through legal processes. Tenn. Comp. R. & Regs. §1200-8-6-.05(8); *accord Conley*, 236 S.W.3d at 730 (physician must personally approve written recommendation that individual be admitted to nursing home and remain under care of physician while at nursing home).

The *Conley* court determined that the decision to admit the individual at issue in that case was a matter of medical science or art requiring specialized skills and was therefore subject to the Tennessee Medical Malpractice Act:

> In spite of Plaintiff's contentions that the decisions to admit and retain Mr. Johnson were administrative decisions that were based on economics, we have concluded that the key decision, whether Mr. Johnson was appropriate for placement . . . , involved matters of the medical arts and/or sciences, requiring specialized skills not ordinarily possessed by a lay person. The fact that the Administrator . . . was also involved in the decisions to admit and retain Mr. Johnson as a resident does not eviscerate the decisions and recommendations by the medical personnel that Mr. Johnson was appropriate for placement . . . .

*Conley*, 236 S.W.3d at 730.

Assisted living facilities are treated differently from nursing homes, and the applicable regulations permit these facilities to admit and retain an individual if "[t]he resident's treating physician certifies in writing that the resident's needs, including medical services, can be safely and effectively met by care provided in the [facility] . . . ." Tenn. Comp. R. & Regs. §1200-08-25-.08(3)(a). Dr. Conerly was Ms. Bynum's physician in Mississippi while she was residing at Pine Meadows. Dr. Conerly signed a letter dated November 28, 2007, indicating that Ms. Bynum did not need continuous skilled nursing care, and that "based on the type of care an assisted living care residence may provide, [Ms. Bynum's] needs may be met by this community." Dr. Conerly was not deposed and did not testify at trial. No evidence was introduced suggesting that Dr. Conerly had ever visited Elmcroft or that he was familiar with the services and care Elmcroft offered its residents. However, the form on which Dr. Conerly stated Ms. Bynum's needs may be met by an assisted care facility was provided to Dr. Conerly by Elmcroft.

While we agree with Ms. Vice that the regulations governing the admission of individuals into nursing homes are stricter than those governing the admission of individuals into assisted living facilities, the regulations for assisted living facilities require some action be taken by the individual's treating physician. However, Ms. Harrison did not indicate that she relied on the letter from Dr. Conerly in determining that Ms. Bynum was an appropriate resident for Elmcroft. While Ms. Wilson, who was a

14

nurse, conducted a pre-admission assessment of Ms. Bynum before she moved in, this assessment was done over the telephone two weeks before Ms. Bynum was admitted to Elmcroft. There was no evidence that a nurse or other medical professional conducted an in-person assessment of Ms. Bynum prior to her admission into Elmcroft or reviewed her records from Pine Meadows, which would have alerted them to the fact that Ms. Bynum had fallen twice since Ms. Wilson's pre-admission assessment and since Dr. Conerly had dictated his letter.

Therefore, because Ms. Harrison was the person who was ultimately responsible for determining whom should be admitted into Elmcroft, and since she testified she did not rely on either Dr. Conerly's letter or any nurse's recommendation in determining whether Ms. Bynum was an appropriate resident for Elmcroft, we believe these facts support treating Ms. Vice's negligent admission claim as an ordinary negligence claim rather than as a medical malpractice claim. The result may be different in another case where the administrator of an assisted living facility does in fact rely on the treating physician's certification and/or on the nurse's recommendation in deciding to admit an individual, but that is not the case here.

We turn now to Ms. Harrison's decision to retain Ms. Bynum after her falls on December 23, January 5, and January 6. While the regulations indicate an assisted living facility "may admit and permit the continued stay of an individual" if the individual's treating physician provides a written certification, there is no indication in this case that a physician treated Ms. Bynum after her fall on December 23 or January 5. Following her fall on January 6 Ms. Bynum was taken to the hospital, but no evidence was introduced that a physician considered whether Elmcroft was able to continue to meet Ms. Bynum's needs at that time. Ms. Harrison testified she was responsible for determining whether a resident should continue to reside at Elmcroft after they were admitted. Therefore, we believe the jury could consider whether Ms. Harrison was negligent in retaining Ms. Bynum, or whether she was negligent in failing to ask a physician to determine whether Ms. Bynum continued to be an appropriate resident for Elmcroft following her falls on December 23, January 5, and January 6.[4]

## 2. COUNTS AGAINST ELMCROFT

Ms. Vice alleged Elmcroft's CNAs and RAs failed to note Ms. Bynum's falls in her chart and failed to follow the fall protocol Elmcroft established for any resident who suffered any falls. The evidence showed Elmcroft's CNAs and RAs failed to complete the Fall Investigations Tool after any of Ms. Bynum's falls, and they failed to complete the Incident Report after her falls on December 23 and January 5. Like Ms. Harrison, Elmcroft's RAs and CNAs are not medical professionals.

[4]As is the case with Ms. Vice's negligent admission claim, the result may be different in a case where the administrator does in fact rely on a physician's written certification that a resident can be properly cared for by an assisted living facility following a fall or other incident, but that is not the case here.

15

Each of Ms. Bynum's falls at Elmcroft occurred during the day. The evidence Ms. Vice introduced regarding Elmcroft's inadequate staffing levels addressed the staffing levels overnight. The evidence of inadequate staffing levels at night are not relevant to the staffing levels during the daytime, when Ms. Bynum fell, and therefore does not support Ms. Vice's allegation that her mother's injuries resulted from inadequate staffing levels at Elmcroft.

Ms. Vice's allegations that Elmcroft and Ms. Harrison failed to maintain appropriate records, including failing to monitor and document significant changes in Ms. Bynum's condition, does not call into play acts that bear a substantial relationship to the rendition of medical treatment by a medical professional, or concern medical art or science, training, or expertise. Moreover, Ms. Vice's allegations do not include acts or omissions involving a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons.

The testimony presented was that RAs and CNAs were responsible for checking on the residents and for making notes in the residents' charts. Elmcroft's policies were clear that upon any fall by a resident, certain protocols were supposed to be followed, as set forth in the Falls Prevention Tool and in the Falls Intervention Tool. No medical art or science, training, or expertise was required or called for in following these procedures, filling out the paperwork, and taking the necessary steps required by the protocol to lessen the chance that a resident who had fallen would fall again. Accordingly, the negligence claims Ms. Vice alleged against Ms. Harrison and Elmcroft were not medical in nature and thus were not precluded by the Medical Malpractice Act. *See Todd v. Weakley County*, 1998 WL 395172, at *5 (Tenn. Ct. App. July 16, 1998) (holding that "nurse's aides are not health care practitioners because they are not licensed to practice professional nursing pursuant to Title 63 and because their job is to perform unspecialized services for which a licensed practitioner is not needed").

Having determined that Ms. Vice set forth a claim for ordinary negligence against Ms. Harrison and Elmcroft, we must determine whether the evidence presented at trial was sufficient to support the jury verdict. "A claim of common law negligence requires proof of the following elements: a duty of care owed by the defendant to the plaintiff; conduct falling below the applicable standard of care that amounts to a breach of that duty; an injury or loss; cause in fact; and proximate or legal cause." *Gunter v. Laboratory Corp. of America*, 121 S.W.3d 636, 639 (Tenn. 2003) (citing *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998)).

Elmcroft and Ms. Harrison do not deny they owed a duty of care to their resident Ms. Bynum. Ms. Vice presented evidence that the CNAs and RAs breached their duty to Ms. Bynum by not following Elmcroft's protocol of documenting Ms. Bynum's falls and filling out the necessary paperwork following each of her falls. The evidence was sufficient for the jury to find that had the CNAs and RAs properly documented Ms.

16

Bynum's falls and followed the directions set out in those forms, they may have determined the cause of her falls on December 23, January 5, and January 6, which may have prevented her fall on January 9. The jury could have further found, based on the evidence, that had Ms. Bynum not fallen on January 9, she would not have fractured her clavicle.

While Elmcroft and Ms. Harrison argue that the x-rays taken on January 9 immediately following Ms. Bynum's fall did not indicate a fractured clavicle, Ms. Vice's witness Dr. Terry testified the callus that had formed around the fracture suggested the trauma leading to the fracture occurred around January 9. Dr. Terry explained that the x-rays dated January 9 may have been taken from angles that did not show the fracture, or that the fracture may have become displaced subsequently, making the fracture difficult to see on the x-rays taken on January 9. Further, testimony from Ms. Bynum's daughter and granddaughter was sufficient for the jury to find that someone was with Ms. Bynum at all times and that she did not fall and injure her shoulder from the time her granddaughter picked her up from the hospital on January 9 until the time Dr. Terry saw her on February 7.

We therefore conclude that taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all the evidence that supports the verdict, and allowing all reasonable inferences to sustain the verdict, discarding all evidence to the contrary, the record contains material evidence to support the verdict. Consequently, we affirm the trial court's judgment that Elmcroft and Ms. Harrison were negligent in their care of Ms. Bynum and that Ms. Vice is entitled to damages as a result.

### C.  Comparative Fault

Elmcroft and Ms. Harrison next argue the trial court erred when it failed to instruct the jury on the negligence of Dr. Conerly and Ms. Vice.[5] Elmcroft and Ms. Harrison asserted as an affirmative defense that Dr. Conerly and Ms. Vice were completely or partially responsible for Ms. Bynum's injuries and damages. Following the close of evidence at trial, the trial court declined to instruct the jury on either Dr. Conerly's or Ms. Vice's relative fault.

With regard to Dr. Conerly, the court said:

---

[5]Elmcroft and Ms. Harrison describe both Ms. Vice's and Dr. Conerly's alleged negligence as "comparative fault." The law in Tennessee is that "comparative fault" allocates damages among multiple tortfeasors according to their percentages of fault, whereas "comparative negligence" measures a plaintiff's negligence against the defendant(s)' negligence for the purpose of reducing the plaintiff's recovery. *Grandstaff v. Hawks*, 36 S.W.3d 482, 491 n.12 (Tenn. Ct. App. 2000), citing *Coln v. City of Savannah*, 966 S.W.2d 34, 40 (Tenn. 1998).

I find that a claim was made of his negligence in the answer, but I find no further proof that would begin to bring us within any kind of medical malpractice against this doctor, proof to get us started even, much less completed.

With regard to Ms. Vice, the court agreed to instruct the jury on Ms. Vice's obligation to mitigate damages[6] but declined to instruct the jury about any negligence on her part. The court said, "I just can't find any negligence to support comparative fault."

With regard to Dr. Conerly, Tennessee follows the majority of jurisdictions and allows a trier of fact to allocate fault to nonparties when a defendant alleges a nonparty was liable, in whole or part, for the plaintiff's alleged damages. *Austin v. State of Tennessee*, 222 S.W.3d 354, 357-58 (Tenn. 2007); *Dotson v. Blake*, 29 S.W.3d 26, 28 (Tenn. 2000); Tenn. Code Ann. §20-1-119. The plaintiff has the option of adding the nonparty to the case as a defendant, but even if the plaintiff chooses not to add the nonparty as a defendant, the jury may still apportion fault to the nonparty if the evidence supports this allocation.

The only evidence in the record concerning Dr. Conerly is that he signed a letter indicating that as of November 2007, Ms. Bynum's needs could be met by an assisted care residence. Dr. Conerly was not deposed, he did not testify at trial, and there was no evidence implicating him in any tortious conduct. Dr. Conerly was a physician in Mississippi, and there was no evidence that Dr. Conerly was aware of the services Elmcroft provided. Dr. Conerly did not specify that Ms. Bynum was appropriate for Elmcroft; rather, he merely indicated that Ms. Bynum may be appropriate for the type of care an assisted living residence could provide.[7]

Additionally, there was no evidence that Dr. Conerly was aware of any of Ms. Bynum's falls when he signed the letter in November 2007. The evidence suggested Ms. Bynum's falls at Pine Meadows occurred after Dr. Conerly dictated the letter Elmcroft and Ms. Harrison refer to. In addition, the evidence was uncontroverted that Ms.

---

[6]It is not clear how a third party who suffered no damages can have a duty to mitigate damages. We presume the trial court intended that the obligation apply to Ms. Vice as the attorney-in-fact of her mother, since Ms. Bynum had not been competent to take measures to mitigate her own damages, such as going to another doctor sooner. No issue has been raised on appeal regarding the instruction on mitigation. To the extent that defendants claim independent negligent acts of Ms. Vice, such claims would be subject to an analysis under comparative fault principles.

[7]Elmcroft and Ms. Harrison argue Ms. Harrison relied on Dr. Conerly's letter in deciding to admit Ms. Bynum into Elmcroft. However, even if the jury had accepted that evidence, such reliance is irrelevant to the issue whether Ms. Harrison was negligent in retaining Ms. Bynum at Elmcroft following her falls on December 23, January 5, and January 6, and whether Elmcroft's CNAs and RAs were negligent in failing to follow Elmcroft's fall protocol by documenting her falls and determining what may have led to her falls in an effort to prevent future falls.

Bynum's health deteriorated after she moved into Elmcroft, that she did not begin to fall until she had been at Elmcroft for three weeks, and that by the time she fell on January 9 her dementia was much more severe than when she moved in on December 1. Elmcroft and Ms. Harrison failed to present evidence of any conduct by Dr. Conerly that fell below the applicable standard of care he owed to Ms. Bynum. More importantly, they failed to present evidence connecting Ms. Bynum's injuries to any act or failure to act by Dr. Conerly.

The trial court has the duty to instruct the jury on questions of law raised by the proof. *Blackwell v. Westerwall*, 1995 WL 153351, at *4 (Tenn. Ct. App. April 7, 1995). Since there was no proof Dr. Conerly was responsible in any way for the injuries Ms. Bynum suffered while at Elmcroft, the trial court did not err in refusing to instruct the jury on Dr. Conerly's comparative fault.

With regard to Ms. Vice, Elmcroft argues that Ms. Vice was negligent in placing her mother at Elmcroft and in failing to remove her earlier. The evidence showed that Ms. Vice was looking for an assisted living facility that could care for her mother and that Ms. Vice told Ms. Rapp, who was Ms. Vice's only contact at Elmcroft, of her concern about her mother's falls. Ms. Rapp assured Ms. Vice that her mother would be well cared for at Elmcroft, and Ms. Vice believed her. Ms. Vice did not interfere with any of Elmcroft's policies or procedures that might have contributed to Ms. Bynum's falls. She merely trusted that her mother would receive good care at Elmcroft.

Elmcroft and Ms. Harrison introduced no evidence that Ms. Vice neglected any duty she might have had to her mother that contributed to her falls while at Elmcroft. Additionally, with regard to her conduct after her mother left Elmcroft, Ms. Vice introduced testimony that her mother was with someone at all times from the time she left the hospital following her fall on January 9 until the time she saw Dr. Helmhout on January 16, when additional x-rays revealed a broken and displaced clavicle. There was no evidence that Ms. Bynum suffered any falls that might have caused her to fracture her clavicle from January 9 to January 16. Accordingly, we conclude the trial court did not err in refusing to instruct the jury on Ms. Vice's comparative negligence.

### D. Damages

Following the presentation of evidence, the trial court instructed the jury that if it found Elmcroft and Ms. Harrison liable for negligence, it was to determine the appropriate amount of damages to award Ms. Bynum's estate for Ms. Bynum's injuries. The court instructed the jury it could award Ms. Bynum's estate damages for the cost of Ms. Bynum's medical care resulting from Elmcroft's and Ms. Harrison's negligence as well as for her pain and suffering, mental as well as physical. The court also instructed the jury it could award Ms. Bynum's estate damages for the permanency of Ms. Bynum's

injuries that she was required to endure for the remainder of her life and for her loss of enjoyment of life.

The jury awarded Ms. Vice, as Administratrix of Ms. Bynum's estate, damages in the amount of $250,000. The jury was provided with a general verdict form rather than a special verdict form, so they did not specify how they arrived at this figure. Elmcroft and Ms. Harrison argue on appeal that the jury award of $250,000 was based on passion, prejudice, and caprice because the "blackboard" compensatory damages totaled only $3,625.80.

This court addressed the issue of jury awards in the case *Palanki v. Vanderbilt University*, 215 S.W.3d 380 (Tenn. Ct. App. 2006), where we wrote:

> In a civil trial, the trial court acts as the thirteenth juror and therefore may set aside a jury's verdict and order a new trial when justice so requires. Alternatively, the court may suggest a remittitur of the jury award, Tenn. Code Ann. §20-10-102(a), to correct an excessive jury verdict without the time and expense of a new trial. Although the amount of an award is primarily a consideration for the jury to determine, the trial court may suggest a remittitur when the amount of the verdict is excessive, beyond the range of reasonableness, or is excessive as the result of passion, prejudice, or caprice. However, there is no precise mathematical formula which the court can use to assure that judgments in negligence cases are uniform.

*Id*. at 386 (citations omitted); *see Overstreet v. Shoney's*, 4 S.W.3d 694, 717 (Tenn. Ct. App. 1999) (thirteenth juror rule requires trial court to weigh the evidence independently, determine the issues, and decide whether the verdict is supported by the evidence).

The *Palanki* court continued:

> There is no exact yardstick, or measurement, which this court may use as a guide to determine the size of verdicts which should be permitted to stand in cases of this kind. Each case must depend upon its own facts and the test to be applied by us is not what the amount the members of the court would have awarded had they been on the jury, or what they, as an appellate court, think should have been awarded, but **whether the verdict is patently excessive.** The amount of damages awarded in similar cases is persuasive but not conclusive, and, in evaluating the award in other cases, we should note the date of the award, and take into consideration inflation and the reduced value of the individual dollar.

*Palanki,* 215 S.W.3d at 386 (quoting *S. Ry. Co. v. Sloan*, 407 S.W.2d 205, 211 (Tenn. App. Ct. 1965)(emphasis added).

The statute addressing remittiturs provides:

> (a) In all jury trials had in civil actions, after the verdict has been rendered and on motion for a new trial, when the trial judge is of the opinion that the verdict in favor of a party should be reduced and a remittitur is suggested by the trial judge on that account, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make the remittitur, a new trial will be awarded, the party in whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the court of appeals.

Tenn. Code Ann. §20-10-102. The Tennessee Supreme Court has explained the rationale for determining whether a remittitur is proper:

> (T)he Court . . . review(s) and correct(s) the judgment rendered to the extent of **the excess as to which it may very well be said there is no evidence to sustain it**, and that while no court has any right to substitute its own estimate of the damages for that of a jury, yet it has the right to determine the amount beyond which there is no evidence, upon any reasonable view of the case, to support the verdict.

*Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 126 (Tenn. 1980) (emphasis added).

In this case there was testimony by several individuals that Ms. Bynum suffered substantial pain as the result of her injuries that lasted for the remainder of her life. Ms. Vice's daughter and son-in-law testified that Ms. Bynum grimaced in pain whenever her shoulder was touched or she had to be moved from one place to another. Ms. Vice testified that Ms. Bynum would cry out in pain when she was lifted up to be fed, and that she suffered a significant amount of pain up until the time she died, approximately 500 days following her last fall at Elmcroft. In addition, Dr. Terry testified that a non-union fracture like Ms. Bynum's may not ever heal completely, in part due to her age, and that she could continue to suffer pain and discomfort for the rest of her life.

We have recently discussed damages for pain and suffering, loss of enjoyment of life, and permanent injury in the case *Smartt v. NHC Healthcare/McMinnville, LLC*, 2009 WL 482475 (Tenn. Ct. App. Feb. 24, 2009). In that opinion we stated:

> Pain and suffering encompasses the physical and mental discomfort caused by an injury. It includes the wide array of mental and emotional responses that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry.

. . . . .

21

Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life. This type of damage relates to daily life activities that are common to most people. . . .

. . . . .

A permanent injury differs from pain and suffering in that it is an injury from which the plaintiff cannot completely recover. It prevents a person from living his or her life in comfort by adding inconvenience or loss of physical vigor. . . . Permanent injury may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part . . ., or to a mental or psychological impairment.

*Smartt*, 2009 WL 482475, at *22 ns.16, 17, and 18 (citations and quotations omitted).

We also addressed the issue of how a factfinder is to assign a value to these sorts of damages:

The determination of such non-pecuniary losses as pain and suffering damages involves a subjective element not present in the determination of ordinary facts. The jury trial guarantee requires that the subjective element involved be that of the community and not of judges. Damages for pain and suffering and for the loss of enjoyment of life are not easily quantified and do not lend themselves to easy valuation. Determining the amount of these damages is appropriately left to the sound discretion of the jury or the judicial finder-of-fact. When appellate courts are called upon to review a jury's award of non-economic damages, it is not their prerogative to determine whether the award strikes them as too high or too low. Rather the reviewing court must review the evidence in the record to determine **whether material evidence supports a finding that the jury award is within the range of reasonableness and not excessive.**

*Id*. at *21 (citations and quotations omitted) (emphasis added).

Based on the evidence presented at trial, we conclude that the evidence supports the jury award, that it is within the range of reasonableness, and that it is not excessive. Contrary to the argument by Elmcroft and Ms. Harrison, we find no basis to conclude that the jury award was excessive, was tainted with error or confusion, contained an impermissible punitive component, or was the result of passion, prejudice or caprice. Accordingly, we affirm the trial court's judgment in all respects.

## V. Conclusion

For the reasons stated above, we conclude the trial court did not err when it permitted the ordinary negligence claims to go to the jury, when it refused to charge the jury on the comparative fault of Dr. Conerly or Ms. Vice, or when it denied Elmcroft and Ms. Harrison's motions for judgment notwithstanding the verdict or for a new trial, or alternatively, for suggestion of a remittitur. Costs of the appeal are taxed to Elmcroft of Hendersonville, Senior Care, Inc., AL Hendersonville Operations, LLC, and Lisa Harrison, for which execution shall issue if necessary.

_____

PATRICIA J. COTTRELL, JUDGE